FILED

03/27/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0667

DA 22-0667

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 66

MONTANA DEMOCRATIC PARTY and MITCH
BOHN, WESTERN NATIVE VOICE, MONTANA
NATIVE VOTE, BLACKFEET NATION,
CONFEDERATED SALISH AND KOOTENAI
TRIBES, FORT BELKNAP INDIAN COMMUNITY,
and NORTHERN CHEYENNE TRIBE, MONTANA
YOUTH ACTION, FORWARD MONTANA
FOUNDATION, and MONTANA PUBLIC
INTEREST RESEARCH GROUP,

        Plaintiffs and Appellees,

   v.

CHRISTI JACOBSEN, in her official capacity
as Montana Secretary of State,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                   In and For the County of Yellowstone, Cause No. DV 21-0451
                   Honorable Michael G. Moses, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

            Dale Schowengerdt, Landmark Law, PLLC, Helena, Montana

            Leonard H. Smith, Crowley Fleck PLLP, Billings, Montana

            Mac Morris, E. Lars Phillips, Crowley Fleck, PLLP, Bozeman, Montana

            John Semmens, Crowley Fleck PLLP, Helena, Montana

            Christian Corrigan, Solicitor General, Office of the Attorney General,
            Helena, Montana

For Appellees Montana Democratic Party and Mitch Bohn:

    Peter Michael Meloy, Meloy Law Firm, Helena, Montana

    Matthew Gordon, Perkins Coie LLP, Seattle, Washington

    Abha Khanna, Jonathan P. Hawley, Elias Law Group, LLP, Seattle, Washington

    Marilyn Gabriela Robb, Elias Law Group LLP, Washington, District of Columbia

For Appellees Western Native Voice, Montana Native Vote, Blackfeet Nation, Confederated Salish and Kootenai Tribes, Fort Belknap Indian Community, and Northern Cheyenne Tribe:

    Alex Rate, Akilah Deernose, ACLU of Montana, Missoula, Montana

    Jacqueline De Leon, Native American Rights Fund, Boulder, Colorado

    Samantha Kelty, Native American Rights Fund, Washington, District of Columbia

    Theresa J. Lee, Election Law Clinic, Harvard Law School, Cambridge, Massachusetts

    Jonathan Topaz, American Civil Liberties Union, New York, New York

For Appellees Montana Youth Action, Forward Montana Foundation, and Montana Public Interest Research Group:

    Rylee Sommers-Flanagan, Niki Zupanic, Upper Seven Law, Helena, Montana

For Amicus Restoring Integrity & Trust in Elections:

    Rob Cameron, Jackson, Murdo & Grant, P.C., Helena, Montana

    Patrick F. Philbin, John V. Coghlan, Elias George Cipollone O'Brien Annaguey LLP, Washington, District of Columbia

For Amicus Lawyers Democracy Fund:

    Daniel Stusek, Benchmark Consulting, Inc., Helena, Montana

For Amicus Montana Federation of Public Employees:

    Raph Graybill, Graybill Law Firm, PC, Great Falls, Montana

For Amicus Scholars of State Constitutions and Election Law:

Caitlin Boland Aarab, Boland Aarab PLLP, Great Falls, Montana

Submitted on Briefs:  October 25, 2023

Decided:  March 27, 2024

Filed:

_____
                          Clerk

3

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Montana Secretary of State Christi Jacobsen (Secretary) appeals from a July 27, 2022 order of the Thirteenth Judicial District Court, granting summary judgment on plaintiffs' and appellees' claim that House Bill 506 (HB 506) is unconstitutional. The Secretary also appeals from a September 30, 2022 order finding House Bill 176 (HB 176), House Bill 530, § 2 (HB 530), and Senate Bill 169, § 2 (SB 169) unconstitutional. The challenged portion of HB 506 amended § 13-2-205, MCA,[1] which restricted access to absentee ballots to voters currently qualified to vote, where before, those who would be qualified to vote by election day could access an absentee ballot during the early voting period. *See* 2021 Mont. Laws ch. 531. The challenged portion of HB 176 amended § 13-2-304, MCA, which changed the voter registration deadline from the close of polls on election day to noon the day before the election. *See* 2021 Mont. Laws ch. 244. HB 530, § 2, chaptered as 2021 Mont. Laws ch. 534, required the Secretary to adopt administrative rules banning paid absentee ballot collection. Finally, the challenged section of SB 169 amended § 13-13-114, MCA, which revised voter ID requirements such that those wishing to vote with a Montana student ID had to show additional supporting documentation. *See* 2021 Mont. Laws. ch. 254.

¶2 We restate the issues on appeal as follows:

> *Issue One: Did the District Court err in finding § 13-2-205(2), MCA, unconstitutional? (HB 506)*

---

[1] Unless otherwise noted, all references to statutes are to the 2021 versions as enacted in these Bills.

*Issue Two: Did the District Court err in finding § 13-2-304, MCA, unconstitutional? (HB 176)*

*Issue Three: Did the District Court err in finding HB 530, § 2, unconstitutional?*

*Issue Four: Did the District Court err in finding § 13-13-114, MCA, unconstitutional? (SB 169)*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 The Legislature passed HB 506, HB 176, HB 530, and SB 169 during the 2021 Montana legislative session. Plaintiffs and Appellees Montana Democratic Party, Mitch Bohn, Western Native Voice, Montana Native Vote, Blackfeet Nation, Confederated Salish and Kootenai Tribes, Fort Belknap Indian Community, Northern Cheyenne Tribe, Montana Youth Action, Forward Montana Foundation, and Montana Public Interest Research Group (Appellees), each challenged one or more of these four laws.

¶4 The District Court consolidated the cases and conducted a nine-day trial, consisting of both factual and expert witness testimony. Ultimately, the District Court determined that each of the challenged statutes were unconstitutional. We affirm.

*HB 506*

¶5 The Montana Constitution requires a qualified elector to be 18 years old or older. Mont. Const. art. IV, § 2. Prior to the enactment of HB 506, someone who was not yet 18, but who would be 18 by election day, was eligible to register to vote. Section 13-2-205, MCA (2019). Montana law also allows electors to receive and vote with an absentee ballot, as relevant, up to 30 days before an election. Sections 13-13-201, -205, MCA. But in no case are those ballots counted until the day of or day before election day. Section 13-13-241(7)–(8), MCA. HB 506 prohibited an absentee ballot from being issued to an

5

elector who was not yet 18, though they would be 18 by election day. Section 13-2-205(2), MCA.

*HB 176*

¶6    Montana enacted election day registration in 2005, which allowed a voter to both register to vote and vote on election day. Section 13-2-304(1)(a), MCA (2005 Mont. Laws ch. 286, § 1). Election day registration has become wildly popular, with over 70,000 Montanans utilizing it since 2006. In a 2014 referendum, Montana voters rejected eliminating election day registration by a 14-point margin. HB 176 eliminated election day registration for all but a select category of people[2] and pushed the registration deadline back to noon the day before the election. Section 13-2-304(1)(a), MCA.

*HB 530, § 2*

¶7    HB 530, § 2, instructed the Secretary to promulgate rules that would not allow anyone to accept a "pecuniary benefit" to assist a voter by returning their ballot for them (among other ballot assistance activities). *See* 2021 Mont. Laws ch. 534, § 2. It added a civil penalty of $100 for each ballot collected in violation of the rule. Appellees provided evidence that many groups, including Native Americans, people with disabilities, and other voters, rely on organized groups to help them deliver their voted ballots to election officials.

---

[2] Election day registration was still allowed for those who moved within the county but to a different precinct since the last election.

*SB 169*

¶8     Prior to the enactment of SB 169, a Montana elector who wished to vote at the polls needed to show a photo ID (including a driver's license or student ID) that had the elector's name and photo, or, among other things, a current utility bill, bank statement, or paycheck that had their name and address on it.  Section 13-13-114(1), MCA (2019).  The purpose of showing ID at the polling location is to check the name and photo on the ID to verify the person is who they say they are and that they are registered to vote.  The question of whether a person is actually eligible to vote under Montana law is a function of the registration process. *See* §§ 13-2-110, -208, MCA.  SB 169 changed these requirements by listing certain acceptable "primary" photo IDs that would suffice by themselves, such as a Montana driver's license, U.S. passport, or a Montana concealed carry permit. Section 13-13-114(1)(a)(i), MCA.  Other IDs, such as postsecondary education photo IDs, were moved into a class of "secondary" IDs that required an elector to show that ID plus an additional document such as a utility bill, bank statement, or government document that lists the person's current name and address.  Section 13-13-114(1)(a)(ii), MCA.[3]

¶9     The parties filed cross motions for summary judgment on each of the Bills.  On July 27, 2022, the District Court granted appellees' motion for summary judgment on HB 506.  It found that § 13-2-205(2), MCA, severely interfered with the right to vote for the specific subgroup of people who would turn 18 within 30 days before an election by taking away their ability to vote absentee as all other voters in Montana are eligible to do.

---

[3] Although "primary" and "secondary" do not appear in the statute, this is how the parties referred to the two levels of ID in SB 169 and how we refer to them here.

7

The court therefore applied a strict scrutiny analysis and found that § 13-2-205(2), MCA, (HB 506) was unconstitutional as it interfered with the fundamental right to vote. The District Court denied summary judgment on the other three Bills because issues of fact remained.

¶10 The court conducted the nine-day trial on the remaining three Bills. On September 30, 2022, the court ruled that the other three Bills were unconstitutional. It found § 13-2-304, MCA, (HB 176) unconstitutional under the right to vote and equal protection. The court found HB 530, § 2, unconstitutional under the right to vote, equal protection, freedom of speech, due process, and as an improper delegation of legislative power. Finally, the court found that § 13-13-114, MCA, (SB 169) did not implicate the right to vote, but that it was unconstitutional under an equal protection rational basis analysis. The Secretary appeals.

## STANDARD OF REVIEW

¶11 The constitutionality of a statute is a question of law, and we have plenary review of constitutional questions. *State v. Knudson*, 2007 MT 324, ¶ 12, 340 Mont. 167, 174 P.3d 469. Statutes are presumed constitutional, and the party challenging a statute has the burden of proving it unconstitutional or showing that the statute infringes on a fundamental right. *Bd. of Regents of Higher Educ. of Mont. v. State*, 2022 MT 128, ¶ 10, 409 Mont. 96, 512 P.3d 748; *Weems v. State*, 2023 MT 82, ¶ 34, 412 Mont. 132, 529 P.3d, 798; *Mont. Auto. Ass'n v. Greely*, 193 Mont. 378, 382–83, 632 P.2d 300, 303 (1981). If the challenger shows an infringement on a fundamental right, a presumption of constitutionality is no longer available. *Greely*, 193 Mont. at 382–83, 632 P.2d at 303. We review the statute

8

under a higher level of scrutiny and the burden necessarily shifts to the State to demonstrate that the statute is constitutional. *Weems*, ¶ 34. A facial challenge of a statute must show that a law is unconstitutional in all its applications. *Mont. Cannabis Indus. Ass'n v. State*, 2016 MT 44, ¶ 14, 382 Mont. 256, 368 P.3d 1131 (*MCIA*).

¶12 We review a district court's findings of fact for clear error. *Larson v. State*, 2019 MT 28, ¶ 16, 394 Mont. 167, 434 P.3d 241. A finding of fact is clearly erroneous if it is not supported by substantial evidence, the court misapprehended the effect of the evidence, or our review of the record leaves us with a firm conviction that the court was mistaken. *Larson*, ¶ 16. Whether a party is entitled to judgment as a matter of law is a conclusion of law reviewed de novo for correctness. *Speer v. State*, 2020 MT 45, ¶ 17, 399 Mont. 67, 458 P.3d 1016.

**DISCUSSION**

¶13 The right to vote is a clear and unequivocal fundamental right under the Montana Constitution: "All elections shall be free and open, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Mont. Const. art. II, § 13; *Willems v. State*, 2014 MT 82, ¶ 32, 374 Mont. 343, 325 P.3d 1204. Certain powers regarding elections are delegated to the Legislature: "The legislature shall provide by law the requirements for residence, registration, absentee voting, and administration of elections. It may provide for a system of poll booth registration, and shall insure the purity of elections and guard against abuses of the electoral process." Mont. Const. art. IV, § 3.

¶14 However, the Legislature's responsibility must be carefully scrutinized against our most basic right to vote, which is "the pillar of our participatory democracy," and "without

9

which all other[] [rights] are meaningless." *Mont. Democratic Party v. Jacobsen*, 2022 MT 184, ¶ 19, 410 Mont. 114, 518 P.3d 58; Montana Constitutional Convention Commission, Convention Study No. 11: Suffrage and Elections 25 (1971). Notably, Montana's Constitution is a prohibition on legislative power rather than a broad grant of power. *Bd. of Regents*, ¶ 11; *see also* Mont. Const. art. II, § 1 ("All political power is vested in and derived from the people. All government of right originates with the people, is founded upon their will only, and is instituted solely for the good of the whole."); Mont. Const. art. II, § 2; Mont. Const. preamble ("We the people of Montana . . . do ordain and establish this constitution.").

¶15     As an initial matter, the Secretary urges us to adopt the federal *Anderson-Burdick* balancing test when deciding cases under the Montana Constitution's right to vote. Federal courts apply the *Anderson-Burdick* standard to state election laws challenged under the First and Fourteenth Amendments to the United States Constitution. *See Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S. Ct. 1564, 1570 (1983); *Burdick v. Takushi*, 504 U.S. 428, 112 S. Ct. 2059 (1992). Originally, as the Dissent makes clear, *Anderson-Burdick* was a more meaningful test similar to "intermediate scrutiny." Dissent, ¶ 145. However, after four decades of federal precedent, the *Anderson-Burdick* balancing test now often gives undue deference to state legislatures so as not to "transfer much of the authority to regulate election procedures from the States to the *federal* courts." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2341 (2021) (emphasis added); *see also, e.g.*, *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 204–05, 128 S. Ct. 1610, 1624–25 (2008) (Scalia, J., concurring) (proposing a deferential standard of review unless the law is "so

10

burdensome [on the right to vote] as to be virtually impossible to satisfy," which would call for strict scrutiny (internal citations and quotations omitted)); Joshua A. Douglas, *Undue Deference to States in the 2020 Election Litigation*, 30 Wm. & Mary Bill Rts. J. 59 (2021). *Compare Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081, 1086 (9th Cir. 2020) (requiring only a rational basis for a state election law in staying a district court's order which had enjoined the law), *with Mont. Democratic Party*, ¶¶ 20–24 (declining to interfere with district court's application of strict scrutiny at the preliminary injunction stage). This weakening of the *Anderson-Burdick* test leads the Secretary to argue that, under current federal precedent, rational basis review would apply to the laws at issue here when they "minimally burden" the right to vote. When the law does more than minimally burden the right, the Secretary urges a balancing of the constitutional right to vote in Article II with the constitutional provision entrusting the Legislature with authority regarding elections in Article IV.

¶16    This Court can diverge from the minimal protections offered by the United States Constitution when the Montana Constitution clearly affords greater protection—or even where the provision is nearly identical. *State v. Guillaume*, 1999 MT 29, ¶ 15, 293 Mont. 224, 975 P.2d 312; *see also Butte Cmty. Union v. Lewis*, 219 Mont. 426, 433, 712 P.2d 1309, 1313 (1986); *Buhmann v. State*, 2008 MT 465, ¶ 159, 348 Mont. 205, 201 P.3d 70 (Nelson, J., dissenting) ("The delegates intended the Declaration of Rights to stand on its own footing and provide individuals with fundamental rights and protections far broader than those available through the federal system in order to meet the changing circumstances of contemporary life." (internal quotations and ellipsis omitted)); *Moore v. Harper*,

11

143 S. Ct. 2065, 2081 (2023) ("'[a] law violating a constitution established by the people themselves, would be considered by the Judges as null & void.'" (quoting James Madison in the Federal Convention of 1787)). Indeed, as Justice Brennan so aptly put it, "federal law . . . must not be allowed to inhibit the independent protective force of state law—for without it, the full realization of our liberties cannot be guaranteed." William J. Brennan Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 491 (1977).

¶17 We must first decide whether the Montana Constitution affords greater protection of the right to vote than the United States Constitution. We hold that it does. *See Mont. Democratic Party*, ¶ 19.

¶18 The Framers' intent controls our interpretation of a constitutional provision. *Bd. of Regents*, ¶ 11. We generally look first to the plain language to determine intent, but even when the language is clear and unambiguous, we determine constitutional intent by also considering the historical and surrounding circumstances under which the Constitution was drafted, the nature of the subject matter the Framers faced, and the objective they sought to achieve. *Bd. of Regents*, ¶ 11; *see also Nelson v. City of Billings*, 2018 MT 36, ¶¶ 14-15, 390 Mont. 290, 412 P.3d 1058. Part of the surrounding circumstances includes whether the United States Constitution expressly includes a mirror of the right at issue. *Compare State v. Hardaway*, 2001 MT 252, ¶ 14, 307 Mont. 139, 36 P.3d 900, *with Hardaway*, ¶ 34. We may also consider the Constitution as a whole. *State ex rel. Livingstone v. Murray*, 137 Mont. 557, 564, 354 P.2d 552, 555–56 (1960).

¶19 The Montana Constitution has contained a clear, explicit, unequivocal, and strong protection of the right to vote since before statehood: "All elections shall be free and open, and *no power*, civil or military, *shall at any time interfere* to prevent the free exercise of the right of suffrage." Mont. Const. art. II, § 13 (emphasis added); *see also* 1889 Mont. Const. art. III, § 5 (same); 1884 Mont. Const. art. I, § 5 (same). "[N]o power" includes the Legislature, and it must regulate elections in conformance with the right. *Mont. Democratic Party*, ¶ 19. The Dissent contends that because the right existed verbatim before the 1972 constitutional convention, the Framers of the 1972 Constitution (and implicitly the Framers of the 1884 and 1889 Constitutions) could not have intended a broader right than the right to vote "implicit" in the United States Constitution. Dissent, ¶¶ 130, 134.

¶20 However, both the plain meaning of the right, unchanged since 1884, and history show that this right is broad and strong. As acknowledged by the Dissent, the United States Constitution contains no explicit protection of the right to vote. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665, 86 S. Ct. 1079, 1080 (1966) ("[T]he right to vote in state elections is nowhere expressly mentioned [in the United States Constitution]."); *cf. Hardaway*, ¶¶ 14, 34. True, the United States Constitution and Montana Constitution both contain rights to the equal protection of the laws. U.S. Const. amend. XIV; Mont. Const. art. II, § 4. The United States Constitution also prohibits the denial or abridgment of the right to vote based on race, color, previous condition of servitude, and sex. U.S. Const. amends. XV, and XIX. But we decide plaintiffs' challenge under the Montana Constitution's fundamental right to vote—not equal protection.

13

¶21 The Dissent contends that the Montana Constitution's right to vote mirrors the right to vote *implied* in the United States Constitution.[4] Dissent, ¶ 134. Implicit rights embedded in the United States Constitution are subject to expansion or contraction. *See, e.g.*, *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705 (1973); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 142 S. Ct. 2228 (2022). And even when the United States and Montana Constitutions have "nearly identical" express language we can—and have—broken with United States Supreme Court precedent on independent state constitutional grounds when that Court has changed the protections afforded under the United States Constitution. *See, e.g.*, *State v. Bullock*, 272 Mont. 361, 372–73, 901 P.2d 61, 68–69 (1995) (holding that Article II, Section 11, of the Montana Constitution provides broader standing for defendants to challenge searches or seizures for crimes of possession than the nearly identical Fourth Amendment to the United States Constitution); *Guillaume*, ¶ 15 (collecting cases).

¶22 Moreover, if the Framers intended to enshrine the implicit right to vote from the United States Constitution as the Dissent dubiously asserts, then we should look to the right as it stood in 1972 rather than as the Supreme Court interprets it now. *Accord Nelson*, ¶¶ 14–15. The Dissent's own citations show that the United States Constitution's implicit right to vote was viewed much stronger in the 1800s through the 1970s than it is today:

> The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and *any restrictions* on that right strike at the heart of representative government.

---

[4] This is relevant, if at all, to determine what the Framers intended the strength of that right to be when they voted to keep it unchanged in 1972.

. . .

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. *Other rights, even the most basic, are illusory if the right to vote is undermined.*

. . .

> Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a *free and unimpaired manner* is preservative of other basic civil and political rights, *any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.*

. . .

> As long as ours is a representative form of government . . . the right to elect legislators in a *free and unimpaired* fashion is a bedrock of our political system.

*Reynolds v. Sims*, 377 U.S. 533, 555, 560–62, 84 S. Ct. 1362, 1378, 1380–82 (1964) (emphasis added and internal quotations omitted). Nearly a century before *Reynolds*—and two years after our 1884 Constitution was adopted with the language that still exists today—the United States Supreme Court referred to "the political franchise of voting" as a "fundamental political right, because preservative of all rights" and declared that the Legislature had power to reasonably and uniformly regulate elections to secure and facilitate the exercise of the right as long as "under the pretence and color of regulating, [it did not] subvert or injuriously restrain the right itself." *Yick Wo v. Hopkins*, 118 U.S. 356, 370–71, 6 S. Ct. 1064, 1071 (1886) (internal quotations omitted); *see also Harper*, 383 U.S. at 670, 86 S. Ct. at 1083 (requiring strict scrutiny where right to vote asserted and citing *Reynolds* and *Carrington v. Rash*, 380 U.S. 89, 85 S. Ct. 775 (1965) for same test);

15

*Kramer v. Union Free Sch. Dist.*, 395 U.S. 621, 626–27, 89 S. Ct. 1886, 1889–90 (1969); *Wesberry v. Sanders*, 376 U.S. 1, 17–18, 84 S. Ct. 526, 535 (1964); *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S. Ct. 995, 1000 (1972) ("In decision after decision, this Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction. . . . [B]efore that right to vote can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet *close constitutional scrutiny*." (internal citations, quotations, and brackets omitted, emphasis added)). The right to vote was strongly protected by the United States Supreme Court prior to *Anderson-Burdick*. Thus, if the Framers did intend to mirror the protections implicitly afforded in the United States Constitution when they left the right to vote unchanged in the 1972 Constitution, they intended the strong protections of that time—which demanded close constitutional scrutiny for laws impacting the right to vote.

¶23 Our own long history construing the right before 1972 is also instructive. We have long held that the right to vote freely and unimpaired preserves—and is a bulwark for—other basic civil and political rights. *See Peterson v. Billings*, 109 Mont. 390, 395, 96 P.2d 922, 924–25 (1939) ("The elective franchise is not conferred upon the citizen by the legislature, or by virtue of legislative enactments. The right to vote is a constitutional right, and is one of the bulwarks of our form of government and system of civil liberty." (internal quotation omitted)). We have also long carefully scrutinized laws which interfered on the right. *See, e.g.*, *Harrington v. Crichton*, 53 Mont. 388, 394–96, 164 P. 537, 539–40 (1917).

¶24 The Montana Constitution as a whole also reflects the people's desire to retain authority—of which the right to vote is essential. *Peterson*, 109 Mont. at 395, 96 P.2d at

16

924–25. Beginning with the preamble to the Constitution, it highlights that "the people of Montana . . . do ordain and establish this constitution." The people then declared their rights first and foremost, beginning with their rights of popular sovereignty and self-government. Mont. Const. art. II, §§ 1–2. They then declared a litany of other rights, including a clear and unequivocal right to vote. Mont. Const. art. II, § 13. The people reserved their right to establish laws by initiative and approve or reject laws by referendum; retained the power to revise, alter, or amend the Constitution; and established their right to vote for all three branches of government. Mont. Const. art. III, §§ 4–5; art. V, §§ 1, 3; art. VI, § 2; art. VII, § 8; art. XIV, §§ 1–3, 8–9.

¶25 They also granted to the Legislature the responsibility to "provide by law the requirements for residence, registration, absentee voting, and administration of elections" and to "insure the purity of elections and guard against abuses of the electoral process," but in no way does this responsibility allow the Legislature to enact laws contravening such other rights. Mont. Const. art. IV, § 3; *accord Forty-Second Legislative Assembly v. Lennon*, 156 Mont. 416, 428, 481 P.2d 330, 336 (1971); *Great Falls Tribune Co. v. Great Falls Pub. Sch.*, 255 Mont. 125, 130, 841 P.2d 502, 505 (1992).

¶26 The Dissent also claims the Framers did nothing more than carry forward, without any discussion, the same language from the 1889 Constitution's right to vote. Dissent, ¶ 130. Not true. The history from the constitutional convention supports that the Framers continued to intend a strong right to vote remain in the Constitution. The Bill of Rights Committee "felt that [Section 13] should be left as is, a *guarantee* that the right of suffrage *shall not be interfered with*" and thus left it verbatim from the prior Constitution. Montana

17

Constitutional Convention, Committee Proposals, Vol. II, p. 634 [hereinafter Committee Proposals] (emphasis added). They went on to say, however, that Section 13 is supplemented by the proposals of the General Government Committee on Suffrage and Elections. Committee Proposals, p. 634. Thus, the Framers' discussion on these proposals is also instructive. That committee proposed, and the delegates ultimately adopted, what is now Article IV, Section 3, of the Montana Constitution. The minority proposal, which was substantially adopted, "centered on the word 'registration' in section 3" which was "aimed primarily at eliminating antiquated requirements which unnecessarily burden the potential voter." Committee Proposals, Vol. I, p. 342.

¶27 The Framers of the Montana Constitution understood this strong protection when they retained the right in our 1972 Constitution as seen in their lengthy discussion in which they first voted to require election day registration and later amended Article IV, Section 3, to encourage election day registration. A vast majority of delegates voted in favor of this proposal to protect the right to vote from registration deadlines that had infringed on the right to vote. S*ee generally* Montana Constitutional Convention, Verbatim Transcript, February 17, 1972, Vol. III, pp. 400–13, 428–52 [hereinafter Convention Transcript]; *see, e.g.*, Convention Transcript, p. 401 ("[T]he act of voting is not a privilege that the state merely hands out, but it is a basic right—a right that in no way should be infringed unless for very good reasons."); Convention Transcript, p. 402 ("It is our contention that the right to vote is so sacred and so important that it does deserve Constitutional treatment. . . . If we are to have a true participatory democracy, we must insure that as many people as possible vote for the people who represent them in government."); Convention Transcript,

18

p. 409 ("I came over here to preserve the rights of the public. The only way you preserve the rights of the public is to preserve their vote, because that's the only power the public has."); Convention Transcript, p. 445 (discussing areas of the Bill of Rights that the Framers saw as sacred and in need of definite protection and "the right to vote is certainly the most sacred right of them all"); *see also Mont. Democratic Party*, ¶ 35 ("The delegates' discussion demonstrates they understood Article IV, Section 3 as ultimately protecting the fundamental right to vote.").[5]  In a later discussion, the Framers rejected a proposal that would have allowed the Legislature to amend the Constitution without submitting the amendment to the people because it would be "a filching of the peoples' rights." Convention Transcript, pp. 501–05.  The Framers of the 1884, 1889, and 1972 Montana Constitutions clearly intended to strongly protect the right to vote as seen through the plain language of the right, history, the Constitution as a whole, and the Framers' discussion on supplemental constitutional provisions.

¶28    Given the importance of the right to vote granted in Article II of the Montana Constitution, we must decide whether the responsibility regarding elections given to the Legislature in Article IV of the Montana Constitution is important enough for us to apply the "persuasive non-binding interpretive framework" of the unduly deferential balancing

---

[5] The Dissent criticizes these statements as cherry picked, but a full reading of the discussion shows that the vast majority of delegates were in favor of a strong and protective right to vote.  Although we will refrain from using the Framers' discussion when it shows two, or even three positions that do not manifest a collective intent, *see Keller v. Smith*, 170 Mont. 399, 408–09, 553 P.2d 1002, 1008 (1976), we will use them, as here, when the discussion shows an intent of the majority. *See, e.g.*, *Nelson*, ¶¶ 14–21.  Here, the discussion overwhelmingly showed an intent for a strong right to vote.  The only position which was inconsistent was whether enactment of election day registration should be mandatory or left to legislative discretion. *See* Discussion on Issue Two in this Opinion, ¶¶ 64-69, for further analysis of this point.

test employed by *Anderson-Burdick* and its federal progeny. Dissent, ¶ 145. Although we have adopted balancing tests like those sought by the Secretary when a case involved two competing Article II rights, *see State ex rel. The Missoulian v. Mont. Twenty-First Judicial Dist. Court*, 281 Mont. 285, 296, 304–05, 933 P.2d 829, 836, 841 (1997), we have rejected similar balancing arguments when a mandate of power given in Article X of the Montana Constitution was limited by an express right conferred by Article II of the Constitution. *See generally Great Falls Tribune*, 255 Mont. 125, 841 P.2d 502.

¶29   In *Great Falls Tribune*, the Great Falls Public Schools' Board of Trustees argued that the right to know in our Constitution should be balanced against the constitutional grant of power given to the Board to supervise and control schools. *Compare* Mont. Const. art. II, § 9, *with* Mont. Const. art. X, § 8. We held that "despite the mandate of power given the local boards to control their schools, Article X, Section 8, does not confer on school boards the power to act in violation of express guarantees contained in the Constitution. For example, school boards must comply with . . . the right of suffrage." *Great Falls Tribune*, 255 Mont. at 130, 841 P.2d at 505.

¶30   Similarly, although the Legislature is given power regarding elections, it may not exercise that authority in a way that violates the freedom and openness of our elections or interferes with the free exercise of the right of suffrage. Mont. Const. art. II, § 13; Mont. Const. art. IV, § 3; *Mont. Democratic Party*, ¶¶ 19, 36. We have held that the Legislature's responsibility to pass laws to ensure the purity of elections and guard against abuses of the electoral process "prohibits the legislature from enacting laws contravening such goals." *Lennon*, 156 Mont. at 428, 481 P.2d at 336 (discussing a provision of Article IX, Section 9,

20

of the 1889 Montana Constitution that is similar to the provision now in Article IV, Section 3, of the 1972 Montana Constitution). The Legislature's duty is "first to secure to the voter a free, untrammeled vote, and, second, to secure a correct record and return of that vote." *Harrington*, 53 Mont. at 394, 164 P. at 539. It is our solemn duty "to review the Legislature's work to ensure that the right of suffrage guaranteed to the people by our Constitution is preserved" and to ensure rules which were intended to "prevent fraud and injustice" do not become "instrument[s] of injustice." *Mont. Democratic Party*, ¶¶ 19, 36; *Harrington*, 53 Mont. at 394–96, 164 P. at 539–40.

¶31 The *Anderson-Burdick* test requires strict scrutiny only for a law that "severely burdens" the right to vote, which is undefined but has been suggested to be only those laws "so burdensome as to be virtually impossible to satisfy." *Crawford*, 553 U.S. at 205, 128 S. Ct. at 1625 (Scalia, J., concurring) (internal citations and quotations omitted). This standard finds no textual or historical support in the Montana Constitution. Our Constitution affords no suggestion that a person should have to mount all but the "virtually impossible" hurdle simply to participate in the most elemental characteristic of citizenship.

¶32 What is more, the *Anderson-Burdick* standard appears somewhat amorphous. For example, the United States Supreme Court noted in *Anderson* that "it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Anderson*, 460 U.S. at 793, 103 S. Ct. at 1572. But the Court in *Crawford* then rejected a view that would consider the burdens on only one class of voters, indicating that if a statute facially imposes a restriction with "broad application to all [the

21

State's] voters," it "imposes only a limited burden on voters' rights." *Crawford*, 553 U.S. at 202–03, 128 S. Ct. at 1623 (plurality opinion) (internal quotations omitted). Even if the law results in a heavy burden on some voters, it nonetheless clears the federal bar without intense scrutiny if the law uniformly imposes the same burden on all voters. *Crawford*, 553 U.S. at 205, 128 S. Ct. at 1625 (Scalia, J., concurring). As the three-member concurring opinion emphasized—noting the 14th amendment hook for voting rights—"a generally applicable law with disparate impact is not unconstitutional" without "proof of discriminatory intent." *Crawford*, 553 U.S. at 207, 128 S. Ct. at 1626 (Scalia, J., concurring). Given the textual strength and history of Montana's explicit constitutional protection, and its independent analysis from the equal protection clause, we should not put its independent force at risk of dilution by later federal precedents. We thus decline to adopt the federal *Anderson-Burdick* standard, which now provides less protection than that clearly intended by the plain language and history of the Montana Constitution's right to vote.

¶33    Without a doubt, "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick*, 504 U.S. at 433, 112 S. Ct. at 2063 (internal quotations omitted). But if the Legislature passes a measure that impacts "the free exercise of the right of suffrage," it must be held to demonstrate that it did "not choose the way of greater interference." *Dunn*, 405 U.S. at 343, 92 S. Ct. at 1003. This standard should govern equally when a facially neutral restriction disproportionately impacts identifiable groups of voters. *Accord Crawford*, 553 U.S. at 236, 128 S. Ct. at 1643 (Souter, J., dissenting)

22

(expressing the view that the challenged statute "crosses a line when it targets the poor and the weak"). Montana best serves the independence of its explicit constitutional guarantee of the right to vote by retaining a state-constitution-driven analytical framework for evaluating challenges to voting regulations so as to maintain that strong protection of every person's right to vote.

¶34 Montana caselaw holds that when a law impermissibly interferes with a fundamental right, we apply a strict scrutiny analysis. *Wadsworth v. State*, 275 Mont. 287, 302, 911 P.2d 1165, 1173–74 (1996). We determine whether a law impermissibly interferes with a fundamental right by examining the degree to which the law infringes upon it. *Wadsworth*, 275 Mont. at 302, 911 P.2d at 1173; *Driscoll v. Stapleton*, 2020 MT 247, ¶ 18, 401 Mont. 405, 473 P.3d 386; *see also Finke v. State ex rel. McGrath*, 2003 MT 48, ¶¶ 17–19, 314 Mont. 314, 65 P.3d 576 (holding that, except in special interest elections, "if a challenged statute grants the right to vote to some [citizens] and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest." (quoting *Kramer*, 395 U.S. at 627, 89 S. Ct. at 1890)). Plaintiffs have the burden of demonstrating the law interferes with all electors' right to vote generally, or interferes with certain subgroups' right to vote specifically. *Cf. Driscoll*, ¶¶ 18, 21. As such, when a law impermissibly interferes with the right to vote, we will apply strict scrutiny. Under strict scrutiny analysis, the State must show that a law is the least onerous path to a compelling state interest. *Wadsworth*, 275 Mont. at 302, 911 P.2d at 1174.

¶35 As discussed, the Montana Constitution strongly protects the fundamental right to vote. Mont. Const. art. II, § 13. Yet it also entrusts the Legislature with the responsibility

23

of providing procedures for conducting our elections. Mont. Const. art. IV, § 3. As such, strict scrutiny is inappropriate when the law has not interfered with the right to vote but has only minimally burdened it. *Accord State ex rel. Bartmess v. Board of Trustees*, 223 Mont. 269, 275, 726 P.2d 801, 804 (1986).

¶36    When a right is not fundamental but is still protected in our Constitution, we apply our own "middle-tier analysis," which balances the rights infringed and the government interest served by the infringement. *See, e.g.*, *Butte Cmty. Union*, 219 Mont. at 434, 712 P.2d at 1313–14 (welfare under the pre-1988 amendment to Article XII, Section 3(3), of the Montana Constitution); *Bartmess*, 223 Mont. at 275, 726 P.2d at 805 (education).[6]

¶37    If a statute does not implicate a fundamental right under the Constitution, we review it under a rational basis analysis, which upholds the law if it is rationally related to a legitimate government interest. *Mont. Shooting Sports Ass'n v. State*, 2010 MT 8, ¶ 20, 355 Mont. 49, 224 P.3d 1240. But rational basis review is inappropriate when the right to vote is implicated given the protections afforded by our most basic right under the Montana Constitution.

¶38    This Court has yet to determine the level of scrutiny to apply when a law does not impermissibly interfere with the fundamental right to vote but minimally burdens it. *See Mont. Democratic Party*, ¶ 24; *Driscoll*, ¶ 20. The Secretary urges us to adopt rational basis review given that the Constitution also gives the Legislature authority regarding

---

[6] This standard is unique from the federal "intermediate scrutiny."

elections.[7] Mont. Const. art. IV, § 3. However, we hold that when a law minimally burdens the right to vote, but does not impermissibly interfere with it, middle-tier analysis is appropriate. *Cf. W. Tradition P'ship v. AG*, 2011 MT 328, ¶ 34, 363 Mont. 220, 271 P.3d 1, *judgment rev'd sub nom. on other grounds by Am. Tradition P'ship, Inc. v. Bullock*, 567 U.S. 516, 132 S. Ct. 2490 (2012) (citing federal caselaw that analyze First Amendment cases under intermediate scrutiny if a law places only a minimal burden on speech).

¶39    In deciding middle-tier analysis was appropriate, this Court has said "[t]he old rational basis test allows government to discriminate among classes of people for the most whimsical reasons." *Butte Cmty. Union*, 219 Mont. at 434, 712 P.2d at 1314. A rational basis classification is appropriate in many situations, such as in economic regulation cases where fundamental rights are not implicated. In such cases, the Legislature is in the best position to make policy decisions and we will afford deference. *See, e.g.*, *MCIA*, ¶ 31. However, the right to vote is fundamental and it is this Court's duty to review the

---

[7] The Secretary devotes one page of its nearly 90-page brief to argue that the Elections Clause of the United States Constitution prevents our review of these four laws. *See* U.S. Const. art. I, § 4. We wholly reject this argument. Like the responsibility granted to the Legislature in Article IV, Section 3, of the Montana Constitution, the Elections Clause is subject to other provisions of our Constitution, such as the right to vote. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."); *State v. Gateway Mortuaries, Inc.*, 87 Mont. 225, 238–39, 287 P. 156, 159 (1930). Indeed, "constitutional provisions governing the exercise of political rights [are] subject to constant and careful scrutiny." *Smiley v. Holm*, 285 U.S. 355, 369, 52 S. Ct, 397, 400 (1932). *Smiley* considered the legislative power under the Elections Clause and concluded it was subject to state constitutions. *Smiley*, 285 U.S. at 369, 52 S. Ct. at 400. The United States Supreme Court has recently revisited this argument and held that the "Elections Clause does not insulate state legislatures from the ordinary exercise of state judicial review." *Moore*, 143 S. Ct. at 2081; *see also Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817–18, 135 S. Ct. 2652, 2673 (2015) ("Nothing in [the Elections] Clause instructs . . . that a state legislature may prescribe regulations on the time, place, and manner of holding federal elections in defiance of provisions of the State's constitution.").

Legislature's work to ensure that the right to vote guaranteed by the Montana Constitution is preserved. *Mont. Democratic Party*, ¶ 19. Rational basis review does not allow for such considerations. *See, e.g.*, *MCIA*, ¶ 22 ("The legislation's purpose does not have to appear on the face of the legislation or in the legislative history, *but may be any possible purpose of which the court can conceive.*" (internal quotations omitted and emphasis added)). The Legislature must regulate elections in conformance with Article II, Section 13, of the Montana Constitution. *Mont. Democratic Party*, ¶ 19. Thus, when a law implicates the right to vote, rational basis review is inconsistent with the Montana Constitution's strong and explicit protections of the right.

¶40 Under our middle-tier analysis, which we developed in *Butte Community Union*, we balance the rights infringed and the governmental interest to be served by the infringement. *Bartmess*, 223 Mont. at 275, 726 P.2d at 805; *Butte Cmty. Union*, 219 Mont. at 434, 712 P.2d at 1313–14. Our first inquiry is whether the State has shown that the classification is reasonable (i.e., not arbitrary and justified by relevant and legitimate state interests). *Butte Cmty. Union*, 219 Mont. at 434, 712 P.2d at 1314. This first step is similar to rational basis review except that the burden is on the State to show that the law is reasonable rather than us upholding it if we can conceive of "any possible purpose" for the legislation.[8]

---

[8] We do not hold, as the Dissent asserts, that the State necessarily has an evidentiary burden to show its interests in a law, and its citation to *Greely* is unenlightening. Dissent, ¶¶ 161–163. The Dissent's argument that the State could merely cite to Article IV, Section 3, of the Montana Constitution and be automatically forgiven for any number of laws interfering with the right to vote is not supported by precedent or the Constitution—"[t]he mere recitation of a compelling state interest in the [law] itself would not be conclusive." *Greely*, 193 Mont. at 383, 632 P.2d at 303. Nor does our analysis below require any such thing. *See, e.g.*, Opinion ¶ 102 (taking notice that we have found a compelling interest that the Secretary asserts for its support of HB 530). But even with a compelling interest, the State must still necessarily demonstrate that the law is narrowly

*MCIA*, ¶ 22; *Butte Cmty. Union*, 219 Mont. at 432–34, 712 P.2d at 1312–14. Given the importance of the right to vote in our Constitution, we think it improper for us to imagine possible reasons the Legislature has enacted a law that burdens the right to vote. *Accord Kramer*, 395 U.S. at 627–28, 89 S. Ct. at 1890 ("[W]hen we are reviewing statutes which deny some residents the right to vote, the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court can conceive of a 'rational basis' for the distinctions made are not applicable.").

¶41 Our second step under middle-tier analysis is to examine whether the asserted government interest is more important than the infringement of the right. *Bartmess*, 223 Mont. at 275, 726 P.2d at 805; *Driscoll*, ¶ 18.

¶42 For example, *Butte Community Union* permanently enjoined a law which restricted certain welfare benefits from able-bodied individuals under 50 with no minor children. *Butte Cmty. Union*, 219 Mont. at 428, 712 P.2d at 1310. Under the first step of middle-tier analysis, this Court found that the Legislature's classification was arbitrary because the State had not shown "that misfortunate people under the age of 50 are more capable of

---

tailored to its interest—whether factually or otherwise. *Greely*, 193 Mont. at 383, 632 P.2d at 303; *Wadsworth*, 275 Mont. at 302, 911 P.2d at 1174; *W. Tradition P'ship*, ¶ 35. As discussed above, challengers have the initial evidentiary burden of demonstrating the burden or interference of a statute implicating the right to vote. The State then has the burden of showing (through notice, argument, or otherwise) interests and tailoring that satisfy the appropriate level of scrutiny. Evidence produced at trial may also establish that the State's purported interest is a "mere recitation" that is not in fact conclusive. Nor do we require fact-finding by the Legislature and recited in legislation to uphold a law. But in the face of evidence presented by plaintiffs that the State's alleged justifications are not furthered by the law, the State may not just rest on mere recitations of an interest to prevail. *Cf.* M. R. Civ. P. 56(e)(2). Even *Anderson-Burdick* originally required *the State* to put forward "precise interests" in justification of the burdens imposed by the law. *Anderson*, 460 U.S. at 789, 103 S. Ct. at 1570; *Burdick*, 504 U.S. at 434, 112 S. Ct. at 2063.

surviving without assistance than people over the age of 50." *Butte Cmty. Union*, 219 Mont. at 434, 712 P.2d at 1314. Under the second step, we held that a balancing of the State's interests with the infringement of those under 50 not receiving welfare also did not tip the scales in the State's favor. We balanced the State's interest in saving money and held that it was not as important as welfare recipients' interests because the State was not in a financially unsound position that justified taking away the constitutionally granted benefit. *Butte Cmty. Union*, 219 Mont. at 434, 712 P.2d at 1314.

¶43 We also applied our middle-tier analysis in *Bartmess*, where we upheld a Lewis and Clark County School District requirement that Helena high school students participating in extracurricular activities maintain a 2.0 GPA. *Bartmess*, 223 Mont. at 270, 726 P.2d at 802. After noting that various aspects of education could be fundamental, we held that the educational aspects of extracurricular activities were subject to middle-tier analysis. *Bartmess*, 223 Mont. at 275, 726 P.2d at 804. Under the first prong, we concluded the 2.0 rule was reasonable because "it cannot be denied that the rule is an incentive" for students wishing to participate in extracurricular activities and because it "promotes adequate time to study" for those below the 2.0 average. *Bartmess*, 223 Mont. at 276, 726 P.2d at 805. Under the second prong, we concluded that the general interest in developing full student potential and providing a quality public education outweighed the students' interests in participating in extracurricular activities. *Bartmess*, 223 Mont. at 276, 726 P.2d at 805. In *Kaptein by & Through Kaptein v. Conrad Sch. Dist.*, 281 Mont. 152, 161–62, 931 P.2d 1311, 1316–17 (1997), we again held the school district's decision to limit participation in extracurricular activities to those enrolled in the public school system met middle-tier

analysis because (1) limiting participation within the public school system was reasonable given the Constitution's heavy emphasis on "a system," and (2) the district's exclusion, for the purpose of effectively integrating academics with extracurricular activities, outweighed the private-school-student's interest in participation.

¶44     We applied middle-tier analysis in *Deaconess Medical Ctr. v. Dep't of Soc. & Rehab. Servs.*, 222 Mont. 127, 720 P.2d 1165 (1986), where we upheld the constitutionality of both a state statute and a county rule that limited state assistance for medical benefits to people below certain incomes.  The statute in *Deaconess* limited medical assistance to those whose income was below 300% of the limit for general welfare assistance.  Under the first prong of middle-tier analysis, we held that the statute was reasonable because it was reasonable to assume that someone with an income three times higher than that needed for basic necessities would be able to purchase medical insurance and pay other medical bills.  *Deaconess Medical Ctr.*, 222 Mont. at 132, 720 P.2d at 1168–69.  We then held under the second step that the State's interest in limiting medical benefits to those with an income less than 300% of that needed for general assistance was greater than the people's interest in receiving those benefits.  *Deaconess Medical Ctr.*, 222 Mont. at 132–33, 720 P.2d at 1169.  We reasoned that there would be little incentive for anyone to purchase personal medical insurance if the State could not limit those who were entitled to medical assistance; that most uninsured people would be unable to pay their bills in the event of an emergency; that the costs to the State would become prohibitive; and that those with an income greater than 300% of the general assistance level could reasonably be expected to

obtain their own insurance. *Deaconess Medical Ctr.*, 222 Mont. at 132–33, 720 P.2d at 1169.

¶45    We also subjected the county rule to middle-tier analysis, which limited medical assistance to people with an income below that required for general assistance. We found that rule unreasonable (considered in isolation from the county's other rules) under the first step of middle-tier analysis because the general welfare assistance standard only assumed that people at or above that level were able to pay for their basic necessities without factoring in medical costs. *Deaconess Medical Ctr.*, 222 Mont. at 133, 720 P.2d at 1169. Therefore, it would be unreasonable to assume that people who could only pay for basic necessities would also be able to purchase medical insurance or pay medical bills. *Deaconess Medical Ctr.*, 222 Mont. at 133, 720 P.2d at 1169. However, we held the limitation passed middle-tier analysis for the same reasons as the state statute when considered together with the rest of the county's rules, which only considered the applicant's income level once medical expenses and insurance were deducted from their income. *Deaconess Medical Ctr.*, 222 Mont. at 134, 720 P.2d at 1169–70.

¶46    Thus, when analyzing laws under the right to vote, we first determine whether the challenger has shown that a statute impermissibly interferes with the right to vote. If it does, we apply strict scrutiny, where the State must show that the statute is the least onerous path to a compelling state interest. If the statute minimally burdens the right to vote, we apply middle-tier analysis, where the State must show that the statute is (1) reasonable, and (2) that its asserted interest is more important than the burden on the right to vote.

¶47   *Issue One: Did the District Court err in finding § 13-2-205(2), MCA, unconstitutional?  (HB 506)*

¶48   Section 13-2-205(2), MCA, restricts a voter from receiving or submitting an absentee ballot if they would be eligible to vote on or before election day but were not yet eligible to vote.  Under our framework for analyzing right to vote claims, we first hold that § 13-2-205(2), MCA, does not impermissibly interfere with the right to vote but is subject to middle-tier analysis as it minimally burdens the right to vote.  We hold that § 13-2-205(2), MCA, is not reasonable under the first step of middle-tier analysis.

¶49   The Secretary argues that the Legislature passed the law in an attempt to clarify election laws and make them easier to administer, noting that § 13-2-205(2), MCA, cleared up two issues between §§ 13-13-201(1) and -205, MCA: (1) the law was unclear whether absentee ballots should be issued to registered voters who would be eligible to vote by election day but did not yet meet age or residence requirements, and (2) electors who did receive an absentee ballot may have been voting illegally if they returned their ballot before they had actually met the requirements.  The Secretary argues § 13-2-205(2), MCA, at best, affects a limited subclass of voters and was designed to make sure all voters were treated equally.  Appellees argue that § 13-2-205(2), MCA, deprives that subclass of equal ballot access by eliminating the option of receiving an absentee ballot before the election as every other eligible voter in Montana is entitled to without excuse.  Appellees note that while § 13-2-205(2), MCA, does not disenfranchise voters, the Constitution also protects from State interference with the right to vote.  Mont. Const. art. II, § 13; *Mont. Democratic Party*, ¶ 19.

31

¶50    Under existing Montana law, a voter who has not yet met residence or age requirements to vote, but who will have met them on or before election day, may register to vote. Section 13-2-205(1), MCA. Further, an elector may request an absentee ballot for an election, which, in person, may be done within 30 days prior to an election. Sections 13-13-201(1), -205, MCA.

¶51    Section 13-2-205(2), MCA, does not interfere with the right to vote. No person is prevented from voting by this law, nor did appellees identify any person who could not or did not vote. However, the law takes away from this subclass an option to vote that all other eligible voters have: absentee voting.

¶52    Absentee voting has transformed elections in Montana. Once regarded as a mere privilege from the customary and usual manner of voting, absentee voting has now become the predominate form of voting by all electors in Montana—accounting for almost three quarters of all voters in the 2018 election.[9] By taking this predominate form of voting away from a subclass of voters, § 13-2-205(2), MCA, minimally burdens their right to vote.

¶53    Thus, middle-tier analysis applies, and the Secretary must show (1) that the law is reasonable, and (2) that the government's interests as asserted outweigh the burden on the right to vote.

¶54    The Secretary asserts that allowing someone to turn in their ballot before they turn 18 (although they will be 18 by election day) is illegal voting, and thus it is reasonable to prevent them from voting absentee. The Secretary argues that since a ballot is considered

---

[9] Due to COVID-19, the 2020 election was an all-mail election, so we use 2018 data for a more accurate picture of how the average Montanan votes today.

32

"voted" once it is turned in to the election administrator's office, these people are voting while they are ineligible. *See* § 13-13-222(3), MCA ("For the purposes of this section, an official ballot is voted when the ballot is received at the election administrator's office."). However, other provisions provide that absentee ballots are not actually counted until the day of or day before election day. *Compare* § 13-13-222(3), MCA, *with* § 13-13-241(7)– (8), MCA. State law requires courts to construe statutes in harmony, if possible, and give effect to them all. Section 1-2-101, MCA; *Clark Fork Coal. v. Mont. Dep't of Natural Res. & Conservation*, 2021 MT 44, ¶ 36, 403 Mont. 225, 481 P.3d 198.

¶55 Again, we first look to the plain meaning of the words used, but we must do so in the context of the statute as a whole and in furtherance of the manifest purpose of the statutory provision and the larger statutory scheme in which it is included. *Clark Fork Coal.*, ¶ 36.

¶56 The plain language of § 13-13-222(3), MCA, limits its application to "the purposes of this section," which addresses marking a ballot in person at the election administrator's office before election day. Thus, it does not apply to mailed-in ballots, which are governed by § 13-13-201, MCA, and allows "legally registered elector[s] *or provisionally registered* elector[s]" to vote their absentee ballot by mail. (Emphasis added.) This would seem to dispose of the Secretary's argument, as even provisionally registered voters are allowed to request and cast an absentee ballot. However, this does not resolve the question of a registered 17-year-old attempting to mark a ballot in person before election day. The legislative history is informative.

33

¶57     Section 13-13-222(3), MCA, was first enacted in 2009 with House Bill 19 (HB 19). The original language was substantially the same as it is now. *See* § 13-13-222(4) (2009 Mont. Laws ch. 297, § 24) ("The ballot is considered voted at the time it is received by the election administrator."). HB 19 added a definition for "voted ballot" to mean when a ballot is deposited in the ballot box, received at the election administrator's office, or returned to a place of deposit. Section 13-1-101(35), MCA (2009) (now codified as § 13-1-101(56), MCA). The sponsor of this new section, Representative Pat Ingraham, spoke as to why this legislation was necessary: "Up until the point it's deposited, or received as a voted ballot, you still have opportunities to have a replacement ballot should something arise, in case you've spoiled it, but once it's voted it's voted." Hearing on HB 19 before the House Committee on State Administration, 61st Leg., 9:05:30 (Mont. Jan. 13, 2009) (testimony of Rep. Pat Ingraham, chief sponsor); *accord* § 13-13-204, MCA (procedure for replacing a ballot that has "been received but not voted"). Further, at trial, the Missoula County Elections Administrator testified that although the county verifies the signature on the secrecy envelope when the ballot comes in, it does not start preparing the ballots for counting until four days before the election and does not start counting until election day. *Accord* § 13-13-241(1), (7)–(8), MCA. So although a person may have "voted" in the sense that they would not be able to get another ballot to vote again, their ballot is not officially counted until, at most, the day before the election.

¶58     The distinction the Secretary is now trying to make between classes of voters is arbitrary because § 13-2-205, MCA, was intended to allow only those who are *guaranteed* to be eligible to vote by election day the ability to exercise their right to vote. There is no

34

reasonable distinction in preventing someone from voting absentee when that person has provisionally registered and verified that they will meet age and residency requirements to vote by election day, while the rest of the population is able to vote absentee—including other provisionally registered voters. *See* § 13-2-110(5)(b), MCA; § 13-13-201(4), MCA (allowing provisionally registered voters to vote by absentee ballot). Moreover, the restriction imposes an additional duty for administrators to identify each ballot that comes in from a 17-year-old and it would be absurd to prosecute a 17-year-old who was turning 18 five days before the election for mailing in their absentee ballot nine days before the election.[10] Section 13-2-205(2), MCA, is not reasonable.

¶59 We find § 13-2-205(2), MCA, to be unreasonable and arbitrary. We need not balance the State interests against the burden imposed because the State has not demonstrated that its interests are reasonable.

¶60 Appellees also contend that this Bill was an attempt to discourage young voters and prevent them from voting. The District Court did not address Appellees' equal protection arguments because it had found the law unconstitutional under the right to vote. We also need not resolve Appellee's equal protection claims because the record demonstrates the law arbitrarily and unnecessarily subjects a subclass of electors to different requirements than the rest of the electorate.

---

[10] The Secretary's argument that this Bill was necessary to prevent a 16-year-old from receiving a ballot has no merit. The plain language of § 13-2-205, MCA, prohibits anyone from registering to vote unless they will meet the residence or age requirements "on or before election day." Under the law, only those individuals who will be 18 on or before election day are eligible to (1) register to vote, and (2) receive an absentee ballot up to 30 days before an election. Sections 13-2-205, 13-13-205, MCA.

¶61     We affirm the District Court's grant of summary judgment and hold that § 13-2-205(2), MCA, (HB 506) is unconstitutional.

¶62     *Issue Two: Did the District Court err in finding § 13-2-304, MCA, unconstitutional? (HB 176)*

¶63     The Secretary argues that the Legislature's decision to eliminate election day registration is not subject to judicial scrutiny. We conclude that it is subject to judicial scrutiny and apply our framework. We hold that § 13-2-304, MCA, impermissibly interferes with the right to vote due to its effect on numerous Montanans who utilize election day registration to both register and vote at the same time on election day. Under strict scrutiny, the Secretary does not demonstrate that eliminating election day registration is the least onerous path to a compelling state interest. We thus hold that § 13-2-304, MCA, is unconstitutional.

¶64     The Framers of the 1972 Montana Constitution provided that the Legislature "*may* provide for a system of poll booth registration [(election day registration)]." Mont. Const. art. IV, § 3 (emphasis added). The Legislature provided for election day registration in 2005. *See* 2005 Mont. Laws ch. 286, § 1.[11] Since it was enacted in 2005, over 70,000 Montanans have been able to vote because election day registration allowed them to register and vote at the same time on election day. Indeed, the Secretary agreed at trial that

---

[11] Election day registration is a failsafe that allows eligible voters to vote on election day if they would otherwise not be able to vote due to registration issues. Registration issues may occur on election day due to our sometimes-confusing labyrinth of election laws. For example, voters who have moved from one county to another since the last election and who have not updated their voter registration would be prevented from voting without election day registration unless they could make it back to their old county before polls closed.

36

it led to an improvement in Montana's elections. Significantly, Montanans soundly rejected a referendum that would have eliminated election day registration in 2014. The Legislature passed HB 176 despite vociferous opposition to the Bill in public hearings. HB 176 eliminated election day registration and pushed the registration deadline back to noon the day before the election. *Compare* § 13-2-304(1)(a), MCA (2019), *with* § 13-2-304(1)(a), MCA (2021).

¶65 As an initial matter, the Secretary argues that we need not even apply our framework to determine whether this law is evaluated under strict scrutiny or middle-tier analysis because the plain language of Article IV, Section 3, of the Montana Constitution clearly provides discretion to the Legislature to enact election day registration: "[The Legislature] *may* provide for a system of [election day registration]." (Emphasis added.) The Secretary argues that because this language is permissive rather than mandatory, the Legislature has discretion to both enact election day registration and to take it away for any reason or no reason at all.

¶66 The Framers' intent controls our interpretation of a constitutional provision. *Bd. of Regents*, ¶ 11. We generally look first to the plain language to determine intent, but even when the language is clear and unambiguous, we determine constitutional intent by also considering the circumstances under which the Constitution was drafted, the nature of the subject matter the Framers faced, and the objective they sought to achieve. *Bd. of Regents*, ¶ 11; *see also Brown v. Gianforte*, 2021 MT 149, ¶¶ 33–34, 404 Mont. 269, 488 P.3d 548.

¶67 Although our Constitution uses permissive language that would allow the Legislature to enact election day registration, our review of the Constitutional Convention

37

transcripts does not lead us to the conclusion that the Legislature has the unfettered authority to terminate it outside of constitutional constraints. As initially passed, Article IV, Section 3, directed the Legislature to implement election day registration with mandatory language: "The Legislature *shall* provide for a system of [election day registration]." *See* Convention Transcript, p. 413 (emphasis added). The Framers wanted to protect voters from abuses that had occurred with arbitrary registration laws, which caused many voters to become disenfranchised. Convention Transcript, p. 434; *see also* Convention Transcript, p. 402 ("[R]egistration has been the greatest factor in subverting the turnout of the American electorate in the history of our country."). Later, however—uncomfortable with the mandatory language in case election day registration turned out to be unworkable in Montana—the Framers reopened the debate. *See, e.g.*, Convention Transcript, pp. 429, 436, 438, 444. Significantly, those that opposed the mandatory language were not opposed to election day registration—only to having to amend the Constitution again if it became unworkable. Ultimately, the mandatory language was rejected and replaced with the permissive language in Montana's Constitution today. The provision with the amendment to replace the mandatory language "shall" with the permissive language "may" overwhelmingly passed. *See* Convention Transcript, p. 452.

¶68 Notwithstanding the use of the permissive word "may," it is clear that the Framers' intent was that election day registration should be available as long as it was workable in Montana. *See, e.g.*, Convention Transcript, p. 437 (discussing that the long debate the Framers had about whether the Legislature "may" or "must" enact election day registration

38

had already accomplished their purpose because the Legislature will "take it as a clear mandate that they better do something about [election day registration]."); Convention Transcript, p. 406 ("[We are] saying to government, to the Legislature, we consider the right to vote so precious and so cherished that you shall not limit it by the artificial barrier of registration."); *see generally* Convention Transcript, pp. 400–13, 428–452; *Mont. Democratic Party*, ¶ 35. This does not mean that election day registration is forevermore baked into our Constitution, but it does dispose of the Secretary's argument that the decision to eliminate it is not subject to judicial scrutiny.

¶69 HB 176 is subject to constitutional limitations. *See Big Spring v. Joe*, 2005 MT 64, ¶ 18, 326 Mont. 256, 109 P.3d 219 ("'Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.'" (quoting *Bush v. Gore*, 531 U.S. 98, 104–05, 121 S. Ct. 525, 530 (2000))). Thus, we apply our framework for constitutional analysis of the right to vote and first determine whether § 13-2-304, MCA, impermissibly interferes with the right.

¶70 We hold that § 13-2-304, MCA, impermissibly interferes with the right to vote.[12] The record shows that more than 70,000 Montanans have utilized election day registration to vote since 2005, and that many electors would be disenfranchised without the

---

[12] The Secretary's reliance on *Barilla v. Ervin*, 886 F.2d 1514 (9th Cir. 1989), is inapposite. *Barilla* held that an Oregon constitutional provision adopted by initiative creating a registration deadline 20 days before an election was not in violation of the right to vote under the United States Constitution. *Barilla*, 886 F.2d at 1516–17. As discussed above, the Montana Constitution's right to vote is more protective than the United States Constitution's, and we evaluate § 13-2-304, MCA, (and the other laws at issue) on independent state grounds only under the Montana Constitution. Any citations to federal cases are useful only to add to our discussion of the Montana Constitution and are not an analysis under the United States Constitution.

availability of election day registration. The Secretary argues that these 70,000 Montanans will simply conform to the new law and register at another time. But this ignores voluminous record evidence that shows that a vast majority of these Montanans will in fact be disenfranchised.

¶71 Montanans can "late register" at a county election office any time during the 30 days prior to the election.[13] Nevertheless, election day registration is so popular that the number of people registering on election day alone is nearly equal to the number of people who register in the 29 days leading up to election day combined. Record evidence shows that election day registration typically increases voter turnout by 2–7% compared to not having it. This is due to a number of factors, including: it is some people's habit to register and vote on election day; many people cannot take work off to register and then again to vote; election offices are open late on election day, allowing some who are not able to take off work during regular business hours to register and vote; people who thought they were registered do not recognize there is a problem until they show up to vote on election day; some voters were inactivated from the voter rolls without their knowledge; and election day is by far the most energizing day that gets people excited to register and vote. The Secretary's contention that it is otherwise easy to register before election day does nothing to dispel these conclusions—these people will be disenfranchised without the "final safeguard" of election day registration.

---

[13] Montana has two registration periods: regular registration and late registration. *See* §§ 13-2-301, -304, MCA. During regular registration, a voter can register to vote by mail, at the DMV, at the county election office, and by other methods. During late registration, the only way a voter may register is by going in-person to the county election office.

40

¶72     The Secretary argues that because no one testified at trial that they were unable to register during the late registration period, this law did not burden anyone. But the Secretary's argument ignores the testimony of Thomas Bogle and Sarah Denson. Both were unable to vote in the November 2021 election due to administrative issues with their registration—which could have been easily resolved if election day registration was still in place. It also ignores testimony from Kendra Miller regarding the 59 Montanans who were prevented from voting due to HB 176 in the November 2021 municipal elections.[14]

¶73     Further, record evidence shows that HB 176 will disproportionately affect two groups of voters more than others: first-time voters and Native Americans. More than 60% of Montanans that utilize election day registration are under the age of 34. Many Native Americans also rely on election day registration because of numerous issues they face in voting, including lack of access to mail, transportation, and the long distances to county seats where they can register. Many of these barriers cannot be overcome, or become too costly to overcome, and thus disenfranchise these voters.

¶74     The record clearly shows, and the Secretary does not present evidence to the contrary, that many of these 70,000 Montanans would be disenfranchised without election day registration. The Dissent argues that because the registration deadline used to be 40 days before the election, it does not interfere with the right to vote to push it back here. Dissent, ¶ 133. This is like arguing that because absentee voting was once not allowed, it

---

[14] The effect of HB 176 on general elections will likely be proportionally higher as only 268 Montanans attempted to register in that election on election day compared to 8,053 who registered on general election day in 2018.

would not interfere with the electorate's right to vote to eliminate it today—even though three-quarters of voters in Montana now utilize it to vote. Once the right to vote is granted, lines may not be drawn that are inconsistent with Article II, Section 13, of the Montana Constitution. *Cf. Harper*, 383 U.S. at 665, 86 S. Ct. at 1081; *Big Spring*, ¶ 18; *Finke*, ¶¶ 17–19. Additionally, our holding does not mean that once the Legislature has expanded the right to vote it may never backtrack if the expansion was unwise. Rather, the State must show—depending on if plaintiffs first show the law minimally burdens the right to vote or interferes with it—that the new law meets the correct level of scrutiny. Here, Appellees met their burden: record evidence undeniably shows that the rollback of election day registration will disenfranchise many voters, interfering with their right to vote. The State must therefore overcome strict scrutiny.

¶75 Because § 13-2-304, MCA, interferes with the right to vote, it must overcome strict scrutiny from the courts. Under strict scrutiny, the government must show that the law is the least onerous path to a compelling government interest. *Wadsworth*, 275 Mont. at 302, 911 P.2d at 1174. The Secretary argues the Legislature had two compelling interests in enacting HB 176: reducing administrative burdens on election workers and imposing reasonable procedural requirements to ensure the integrity and reliability of the election process.

¶76 We initially note that the cases the Secretary cites to regarding the State's interest in reducing the administrative burden on election workers hold that this is an "important" rather than "compelling" state interest, which is required for middle-tier analysis rather than strict scrutiny. *See Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1181 (9th Cir.

42

2021); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016). But even assuming its reasons were compelling, the record shows that eliminating election day registration at best shifts the work election workers must do on election day with work they do on the days leading up to the election and vice versa.

¶77   The record shows that regardless of when registration ends, election workers still have the same amount of work. Election day and the days leading up to election day are some of the busiest days of the year for election officials. The only thing that changes is when they do this work. For example, the election administrator of Missoula County testified that in the days leading up to election day, they are busy with early ballot preparation so that they can conduct a quicker count on election day. When HB 176 ended election day registration, Missoula County opened extended registration hours before the new deadline to make sure voters could still register. This shifted some of the work they were doing before election day to election day—indeed, the days leading up to the election can be even more stressful. In any event, the process for registering voters is the same. And because administrative duties that were prepared prior to election day now must be done that day, it can take more time on election day.

¶78   Further, the record shows several ways in which the elimination of election day registration may increase administrative burdens. First, otherwise qualified voters who show up ready to vote may respond poorly to election workers who explain the new law to them and why they cannot vote in that election—this takes time and increases stress. Second, HB 176 did not eliminate election day registration for all groups of voters, so election workers must now identify whether the voter is still eligible to register under

43

§ 13-2-304, MCA. For example, if a voter asserts they had previously registered, the election worker will have to spend time verifying whether there was in fact an administrative error, which would allow the voter to register and vote on that day. Further, some of these voters may be offered a provisional ballot, which requires additional follow-up work for election administrators.[15] *See* § 13-15-107, MCA. With election day registration in place, the election worker does not have to ask any questions or spend any time investigating whether an individual may still register. Rather, any qualified voter may register and vote on election day without determining why they had not previously registered. Third, some counties still registered voters who came in on election day so that they could vote in the next election. Thus, the administrative burden was the same or higher, the law just had the net result of decreasing voters.

¶79 The record is replete with evidence that eliminating election day registration decreases election administrators' work only if voters are disenfranchised. Witnesses

---

[15] At trial, the Secretary argued that Thomas Bogle and Sarah Denson should have been given a provisional ballot because their registration had failed due to administrative error, and it was error for the election judge to not offer one to them. *See* 2022 Election Judge Handbook, Mont. Sec'y of State 62 (Feb. 11, 2022) (providing for provisional voting if a voter's name had been erroneously omitted from precinct register or they had registered at the DMV but the paperwork was never finalized at the election administrator's office). If anything, these stories show the increased administrative burden on election judges. With election day registration, Bogle and Denson would be able to register and vote on election day no matter the reason, and the election official could move on to the next person in line. Without election day registration, the election official needs to explore the reason that each person trying to register on election day is not registered, and either (1) offer a provisional ballot to those who meet one of the qualifications to still register and vote (i.e., administrative error), and follow up on the provisional ballot to determine whether the voter is actually qualified under one of these circumstances before counting the vote, or (2) spend time explaining to frustrated voters why they are not allowed to register and vote on that day while others can. Either way, this is more work for election judges, and, as seen with Denson and Bogle, rife with opportunities for election judges to err and further disenfranchise voters.

testified that the best way to decrease administrative burdens—besides disenfranchising voters—is with better training, better equipment, streamlined protocols, and more election workers.[16] Record evidence comports with the Secretary's admission that election day registration was an improvement in Montana's election processes. Eliminating election day registration is far from the least onerous path to the State's interest in reducing administrative burdens on election workers.

¶80 The Secretary also has not met her burden to show eliminating election day registration is the least onerous path to her compelling interest of ensuring the integrity, reliability, and fairness of the election process. *See Larson*, ¶ 40.

¶81 The Secretary asserts that election day registration causes a "substantial delay" in tabulating votes, which decreases voter confidence in election results. The Secretary relies on testimony from Doug Ellis for support. But this argument misstates the effect of the evidence in the record.

¶82 Ellis testified that he was always able to finish tabulating Broadwater County's votes by the end of the night and he was never criticized for being late with election results. This was true with the other election administrators who testified: the Yellowstone County election administrator testified that he would not have had to stay any later on election

---

[16] As the District Court found, Doug Ellis's (retired election administrator of Broadwater County) testimony that he was limited in his staff by County budgetary constraints should be considered in light of his admission that the County only spent 53% of the amount it budgeted for election salaries and wages in 2020. Further, Ellis's testimony showed that there were additional election judges willing to work in the 2020 election, that he could have increased their pay to recruit more with their budget, and that after he retired his job was split into two positions to further reduce stress.

45

night if election day registration was in place; the retired Rosebud County election administrator testified that election day registration had no ultimate impact on their election day schedule. The trial court found that the Secretary had not provided any evidence that election day registration had ever delayed vote tabulation past statutory deadlines for tabulating votes. We find no clear error in its finding of fact.

¶83 Additionally, there are a number of other factors that lead to delays in tabulation, which have nothing to do with election day registration and are not affected by its elimination. For example, provisional ballots and military-overseas ballots are not counted until after 3 p.m. six days after the election. *See* §§ 13-15-107(8), 13-21-226, MCA. Further, it can take up to 27 days after the election to conduct the canvass to finally determine the vote. Section 13-15-502, MCA. Eliminating election day registration will not change these timelines.[17]

¶84 The record clearly demonstrates that eliminating election day registration interferes with the fundamental right to vote.[18] The elimination is far from the least onerous path the

---

[17] Indeed, as can be seen with the Secretary's argument regarding Thomas Bogle and Sarah Denson, eliminating election day registration will only increase the number of provisional ballots cast, causing higher numbers of votes to be tabulated later. The Secretary asserts that the longer tabulation goes on, the more voter confidence decreases. If the Secretary's argument is correct, eliminating election day registration will only exacerbate this issue by increasing the number of provisional ballots counted six days after the election.

[18] The Dissent's citations to *Crawford* (besides being analyzed under a test we explicitly reject) are unavailing because "the evidence in the record [in *Crawford* was] not sufficient to support a facial attack" on the statute. *Crawford*, 553 U.S. at 189, 128 S. Ct. at 1615. Appellees here, and for HB 530, presented multitude evidence of the number of voters affected and the burden the laws would place on the groups affected. *See Crawford*, 553 U.S. at 200–02, 128 S. Ct. 1622–23.

State could have chosen for its asserted interests. We therefore hold § 13-2-304, MCA (2021), does not survive strict scrutiny and is therefore unconstitutional on its face.

¶85 Because we find § 13-2-304, MCA, unconstitutional under the Montana Constitution's strong protection of the right to vote, we need not evaluate the parties' equal protection arguments.

¶86 *Issue Three: Did the District Court err in finding HB 530, § 2, unconstitutional?*

¶87 HB 530[19] instructed the Secretary to adopt an administrative rule in "substantially" the same form as to prohibit "a person"[20] from receiving "a pecuniary benefit in exchange for distributing, ordering, requesting, collecting, or delivering ballots." 2021 Mont. Laws ch. 534, § 2. HB 530 included a $100 civil fine for every ballot distributed, ordered, requested, collected, or delivered in violation of the law. 2021 Mont. Laws ch. 534, § 2.

¶88 Ballot collection is a service provided by many of the Appellees here—all of whom fall under the prohibition in HB 530. For example, Western Native Voice and Montana Native Vote hire and train local organizers for Get Out the Vote (GOTV) work within Native American reservations. One of the services these groups offer during their GOTV activities is to return absentee ballots to election offices for those who desire it. These organizers are paid for their GOTV work, but in no case are they paid per ballot that they collect. Another group, Disability Rights Montana (not a party to this litigation), has

---

[19] All references to HB 530 herein are to HB 530, § 2, chaptered at 2021 Mont. Laws ch. 534, § 2. This is the only section of HB 530 that Appellees challenge and the only section we evaluate in this Opinion. Chapter 534 has not been codified as statute.

[20] The definition of "person" excluded governmental entities, election administrators and their agents, and mail services. 2021 Mont. Laws ch. 534, § 2.

47

special access to overnight care and treatment facilities. Their paid staff also help return ballots for people with disabilities that request it.

¶89 We note that HB 530 comes on the heels of a similar law which was held unconstitutional in 2020. In 2017, the Ballot Interference Prevention Act (BIPA) was enacted. *See* §§ 13-35-701, –705, MCA (2017). It prohibited all but a select few people from returning other people's ballots for them. Section 13-35-703, MCA. This law was challenged, and we upheld a preliminary injunction of BIPA in *Driscoll v. Stapleton*, 2020 MT 247, 401 Mont. 405, 473 P.3d 386. Two trial courts then found BIPA unconstitutional and permanently enjoined it. *See Driscoll v. Stapleton*, No. DV-20-408 (Mont. Thirteenth Judicial Dist. Sept. 25, 2020); *see also Western Native Voice v. Stapleton*, No. DV-20-0377, 2020 Mont. Dist. LEXIS 3 (Mont. Thirteenth Judicial Dist. Sept. 25, 2020). The permanent injunction in *Driscoll v. Stapleton* was appealed to this Court by then Secretary of State Corey Stapleton. However, current Secretary of State Christi Jacobsen dismissed the appeal. *See Driscoll v. Jacobsen*, No. DA 20-0477, Order (Mont. March 8, 2021).

¶90 As an initial matter, the Secretary argues that this case is not yet ripe for judicial review because the Secretary has not gone through the administrative rulemaking process, and thus we cannot determine what is or is not prohibited by the law. The Secretary argues that until the rulemaking is finished, Appellees will not know whether their groups' activities are prohibited by the law or will be harmed by it. The Secretary cites *Qwest Corp. v. Mont. Dep't of Pub. Serv. Regulation*, 2007 MT 350, 340 Mont. 309, 174 P.3d

496, asserting that *Qwest* prevents our constitutional review of a statute until any administrative rulemaking process is complete.

¶91    Ripeness concerns whether a case presents an actual, present controversy. *Reichert v. State*, 2012 MT 111, ¶ 54, 365 Mont. 92, 278 P.3d 455. The parties must point to actual, concrete conflicts rather than hypothetical, speculative, or illusory disputes. *Reichert*, ¶ 54. Ripeness asks whether an injury that has not yet happened is sufficiently likely to happen or whether it is too contingent or remote to support deciding it presently. *Reichert*, ¶ 55.

¶92    *Qwest* is not on point here. *Qwest* dealt with a potential agency action. Here, on the other hand, plaintiffs challenge the constitutionality of a statute on its face. Qwest sought review of an agency's request for information and was trying to challenge what the agency *might* do with the information in the future. We held that the case was not ripe for review because there was no hardship to Qwest, we did not know what the agency was going to do, and thus there were no facts before the Court. *Qwest*, ¶¶ 21–25.

¶93    This case addresses a present controversy. The Secretary ignores Appellees' unrebutted testimony at trial that shows they have already been harmed by HB 530. Once HB 530 was enacted, Appellees stopped collecting ballots because they were fearful of the $100 penalty they would incur for every ballot they collected, which was effective upon passage and approval. *See* 2021 Mont. Laws ch. 534, § 5. This is not a hypothetical dispute on whether Appellees might be harmed in the future but a current, concrete dispute about the statute that is preventing them from collecting ballots.

¶94    The Secretary argues that its eventual rulemaking would "likely" only focus on a cash-per-ballot exchange ban. However, the challenge here is to the broader language of

the statute itself and not a rule that might be adopted in the future. If the administrative rule narrowed the statute such that it only prohibited cash-per-ballot situations, it would conflict with the plain language of the statute as well as the provisions directing the Secretary to adopt a rule in "substantially" the same form as enacted. *See Michels v. Dep't of Soc. & Rehab. Servs.*, 187 Mont. 173, 177–78, 609 P.2d 271, 273 (1980) ("[U]nless regulations effectively effectuate the purpose of the statute, they are invalid.").

¶95   Thus, because the statute is clear on its face as to what is prohibited and includes a civil fine for this prohibited behavior, and because Appellees are already harmed by it, this case is not a hypothetical dispute and is ripe for review.

¶96   Under our analysis, the first step is to determine whether HB 530 impermissibly interferes with the right to vote. We hold that it does.

¶97   Based on the extensive record before us, the District Court found that Native Americans disproportionately rely on ballot collection to vote, in part due to a history of discrimination around voting, *see, e.g.*, *United States v. Blaine County*, 157 F. Supp. 2d 1145, 1152 (D. Mont. 2001), and also the unique circumstances in Indian country[21] that make it much more difficult to access polling places or post offices. Many electors reside in remote areas and have long distances to polling places or post offices. Many do not have mail service to their homes. All these factors, and more,[22] combine to make it much more

---

[21] *See* 18 U.S.C. § 1151 (defining "Indian country").

[22] The District Court found numerous factors that make voting excessively challenging to Native Americans in Montana. The Secretary does not dispute these findings as clearly erroneous, and they are entitled to deference. M. R. Civ. P. 52(a)(1), (6).

difficult on average for people living on reservations to either get to a polling place on or before election day, or to mail an absentee ballot prior to election day. *See also Driscoll*, ¶ 6 (describing barriers that Native Americans face accessing the right to vote).

¶98    As a result, Native Americans disproportionately rely on ballot-collection services. Appellees collected at least 2,500 ballots in the 2016 and 2018 elections—or roughly 5% of the registered voters living on reservations in Montana each year. However, because BIPA was enjoined just days before the 2020 election, Western Native Voice was unable to fully prepare its collection activities and therefore collected only 400 ballots. Appellees' expert, Alex Street, conducted a statistical analysis between the 2020 primary and the 2016 primary to measure the effect BIPA had on those living on-reservation versus those living off-reservation. His analysis focused only on voters who had already registered to vote absentee in 2016 to maintain a control group. He found that turnout between 2016 and 2020 was steady for those voters who lived off-reservation, with only a 0.2% decline. However, turnout fell for those living on-reservation by 3.5%—a statistically significant negative impact for on-reservation voters. Further, rejection rates of ballots for people living on-reservation increased substantially compared to those living off-reservation in the 2020 election. Thus, Street concluded that HB 530 would have a statistically significant negative impact on voting for Native Americans living on reservations in Montana. The District Court agreed.

¶99    HB 530 takes away the only option to vote for a significant number of Native Americans living on reservations. Thus, it impermissibly interferes with the right to vote, which requires us to review with strict scrutiny.

51

¶100 The Secretary relies on *Brnovich*, regarding an Arizona ballot-collection law similar to HB 530. *Brnovich*, 141 S. Ct. at 2330. However, *Brnovich* is distinguishable in two major ways. First, the case was brought under the federal Voting Rights Act of 1965, 79 Stat. 437 (codified as 52 U.S.C. §§ 10301 et seq.). Here, HB 530 was challenged, among other things, under the Montana Constitution's right of suffrage. Mont. Const. art. II, § 13. Further, unlike here, the *Brnovich* "plaintiffs had presented no records showing how many voters had previously relied on now-prohibited third-party ballot collectors and . . . had provided no quantitative or statistical evidence of the percentage of minority and non-minority voters in this group," nor even claimed that the restriction would make it significantly harder to vote. *Brnovich*, 141 S. Ct. at 2335 (internal quotation omitted). *Brnovich* looked at the totality of the circumstances and balanced the burden imposed against the State's interests. *Brnovich*, 141 S. Ct. at 2338–40. But this is distinct from the test we use under the right to vote.

¶101 The first step under our right-to-vote analysis is to determine whether the law impermissibly interferes with the right to vote, and then to apply the correct level of scrutiny. Under this provision, plaintiffs must first show that the law interferes with the right to vote, and, if it does, the burden shifts to the State to satisfy strict scrutiny. Because Appellees here have shown that HB 530 impermissibly interferes with the right to vote, the Secretary must satisfy strict scrutiny.

¶102 Under strict scrutiny, the Secretary must show that HB 530 is the least onerous path to a compelling state interest. *Wadsworth*, 275 Mont. at 302, 911 P.2d at 1174. The Secretary argues the State has a compelling interest in preserving the integrity of its

52

election process. We have acknowledged such a compelling interest. *Larson*, ¶ 40 ("Montana has a compelling interest in imposing reasonable procedural requirements tailored to ensure the integrity, reliability, and fairness of its election processes."). However, this law is not narrowly tailored to achieve this goal. The Secretary argues that this law is essential to regulate the potentially corrupting influence of money paid in exchange for ballot collection on a per-ballot basis. We agree that someone paid per ballot could be motivated to interfere with the integrity of our elections by coercing and intimidating voters to give them their ballots for their own monetary gain.[23] Although, as the Secretary argues, the Legislature may take preventative steps to "insure the purity of elections," Mont. Const. art. IV, § 3, it must do so in a way that does not interfere with the right to vote or by narrowly tailoring the law to its compelling interest. In that regard, the Legislature could have enacted a narrower law that prohibits only nefarious activity rather than the overly broad law it enacted which also proscribed Appellees' lawful activity. But we note that this type of nefarious activity is already illegal under, among other things, § 13-35-218, MCA.

¶103 Significantly, the Secretary failed to introduce any evidence of fraud related to ballot collection in Montana. The one instance the Secretary cites to, a newspaper article recounting several people who were worried about where their ballots went after they were collected, was merely that—worry. Those complaints were investigated by election

---

[23] *See* Attachment 10 to Docket 102 Joint Notice of Filing at 10, 12, 15–16, 22, *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158 (M.D.N.C. 2020) (No. 20-CV-457) (describing Leslie McCrea Dowless' pay-per-ballot scheme to defraud the 2018 general election in North Carolina).

officials, and, in every case, the voters' ballot had been delivered on time and without issue. *Driscoll*, ¶ 3 n.1.

¶104 The Secretary also argues that the State has a compelling interest in preventing mail-in-ballot fraud. Notably, the Secretary of State conducted a post-election audit of the 2020 general election. Because of the COVID-19 pandemic, that election was conducted entirely by mail. That audit identified no significant problems.

¶105 We also note that the parties found two cases in the last several decades regarding voter fraud in Montana. None of the cases had anything to do with election day registration, ballot collection, student ID, or any of the laws at issue in this case. In the first, a man pled guilty in 2011 for signing his ex-wife's absentee ballot without her permission. The other involved a man trying to register under a fake name. Montana law already criminalizes this behavior, and both were sentenced under § 13-35-207, MCA, which carries a maximum sentence of up to ten years in prison and up to a $50,000 fine. *See also, e.g.*, § 13-35-103, MCA (criminalizing a knowing violation of Montana election laws); § 13-35-201, MCA (criminalizing, among other things, showing someone a marked ballot and soliciting someone to show their ballot); § 13-35-205, MCA (criminalizing changing someone else's ballot); § 13-35-207, MCA (criminalizing numerous acts regarding falsification or deception in elections); § 13-35-209, MCA (criminalizing

fraudulent registration); § 13-35-210, MCA (criminalizing voting multiple times); §§ 13-35-214, -215, -218, MCA (criminalizing certain acts to influence voters).[24]

¶106 The State does not demonstrate that HB 530, § 2 is narrowly tailored to address the State's compelling interests, and it is thus unconstitutional under the Montana Constitution's right to vote. Mont. Const. art. II, § 13. Therefore, we need not discuss the parties' arguments under equal protection, freedom of speech, or due process.

¶107 *Issue Four: Did the District Court err in finding § 13-13-114, MCA, unconstitutional? (SB 169)*

¶108 SB 169 updated several statutes. Section 1 updated the ID requirements for registering to vote under § 13-2-110, MCA. Section 2 updated the ID required to show an election judge at the polls to vote under § 13-13-114, MCA. Section 3 updated ID requirements for provisional voters voting by mail under § 13-13-602, MCA. And section 4 added a failsafe for voters who were unable to meet the ID requirements in § 13-13-114, MCA, under § 13-15-107, MCA. We read Appellees' complaint as only challenging § 13-13-114, MCA (Section 2). *See, e.g.*, Montana Democratic Party First Amended Complaint ¶¶ 3, 59, 61, 63, 67, 70, 72 (challenging only the ID requirements under § 13-13-114, MCA). Further, the parties' briefing and evidence at trial only pertained to showing ID at the polls rather than matters pertaining to the other sections. Thus, we only analyze the constitutionality of § 13-13-114, MCA.

---

[24] Federal law also criminalizes such fraudulent acts. *See, e.g.*, 52 U.S.C. §§ 10307, 20511; *see also United States v. Hill*, (D. Mont. 2023) (No. 9:23-cr-0021) (charging man with violating federal election laws).

¶109 Prior to SB 169, a Montanan already *registered* to vote was required to present a current photo ID with their name on it to an election judge *or* "a current utility bill, bank statement, paycheck, . . . confirmation of voter registration . . . , or other government document" with their name and address on it. Section 13-13-114(1)(a), MCA (2019). If they were not yet registered, a voter would have to comply with §§ 13-2-109, -110(3), and -208, MCA, which verify that the voter is actually eligible to vote in Montana. The purpose of showing an ID at the polls is to confirm that you are the person that has registered to vote.[25] Outside of election day registration, election judges at a polling place do not determine again that an elector is eligible to vote in Montana. The Secretary's own policies specify:

> Since **only** an elector's name and photo are checked when an elector submits photo identification, election judges do not check photo IDs to see whether the address on the identification is current. For example, an out-of-state Driver's License is a valid form of **photo** identification, even if the license is expired or suspended, as long as it has the person's name and photo and is issued by a government agency.

2022 Election Judge Handbook, Mont. Sec'y of State 96 (Feb. 11, 2022) (emphases in original).[26]

---

[25] *See* 2 Mont. Admin. Reg. 170 (Jan. 28, 2022) (explaining that the requirements found in § 13-13-114, MCA, do not address proof of citizenship or Montana residency, which is instead attested to under penalty of perjury by Montana law when registering to vote).

[26] Identification is required at the polls to verify you are who you say you are, but other checks are performed when someone mails in an absentee ballot, such as checking to make sure their signature matches that on file. *See* § 13-13-241(1)(a); *see also* Docket 27 Trial Brief, *United States v. Hill*, (D. Mont. 2023) (No. 9:23-cr-0021) (addressing evidentiary issues of handwriting comparison on voter affidavit).

¶110 The record reflects that some legislators amended § 13-13-114, MCA, to discourage students from voting. As introduced, SB 169, Section 2, did not include a Montana college student ID as a primary form of identification. It was amended in committee to clarify that a photo identification card issued by a Montana college or university is a primary form of identification.[27] *See* S.B. 169.3, 67th Leg., Reg. Sess. (Mont. 2021). However, the Speaker of the House offered an amendment on the House floor during the second reading of SB 169 to strike Montana university photo ID from a primary form of identification and move it down to the secondary form of identification because "if you're a college student in Montana and you don't have a registration, bank statement, or a W2, makes me kind of wonder why you're voting in this election anyway. So this just clears it up that [students] have a little stake in the game." *See also Mont. Democratic Party*, ¶ 31 n.21. Representative Custer spoke in opposition to this amendment, calling it discriminatory and explaining the purpose of showing ID at the polls is simply to verify you are who you say you are, not to verify your eligibility to vote, as is done during registration.[28] Representative Custer, a former Republican member of the House and former county clerk and recorder and election administrator, testified at trial that she believed the amendment was discriminatory because of the perception that students tend to be more liberal and vote accordingly.

---

[27] Prior to SB 169, § 13-13-114, MCA, included "a school district or postsecondary education photo identification" as an example of proper photo identification.

[28] The Legislature also passed legislation that made student registration more difficult. *See* § 13-35-242, MCA (2021 Mont. Laws ch. 494, § 21) (held unconstitutional *Forward Montana v. State*, No. ADV-2021-611 (Mont. First Judicial Dist. filed Feb. 3, 2022)).

¶111 We first determine whether § 13-13-114, MCA, impermissibly interferes with the right to vote. We conclude that it does not. The District Court found that plaintiffs had not identified a single individual who was unable to vote due to the new ID requirements.[29] Further, SB 169, Section 4, allows a voter who cannot provide photo identification to provide a government document along with a declaration of reasonable impediment that allows them to vote. *See* § 13-15-107(3)–(4), MCA. Appellees point to statistical evidence presented at trial that shows a lower likelihood of students having other forms of ID compared to the general population, which they argue shows that students would be denied the right to vote. The District Court found that students are generally less likely to have a form of primary identification. Further, they "often do not receive utility bills, have bank statements addressed to their school addresses, have any reason to have a government issued check, or have a job for which they receive paychecks," which are the secondary documents required if they wish to vote using their student IDs. Although these findings show that the ID law imposes a minimal burden on their right to vote, we do not find it persuasive enough to determine that the right to vote has been impermissibly interfered with in light of other evidence presented at trial. We conclude that the record demonstrates the legislation imposes a minimal burden on student voting.[30]

---

[29] Although Montana Youth Action testified that one of its board members had communicated that they would be relying on their student ID at the polls, there was no testimony that their student ID was their only option and that they could not provide other acceptable forms of ID.

[30] Student groups facially challenge the Legislature's amendment of § 13-13-114, MCA, because of the burden it imposes on all student voters, not as applied to the particular circumstances of certain named student parties. *See Citizens for a Better Flathead v. Bd. of Cnty. Comm'rs*, 2016 MT 325, ¶ 45, 385 Mont. 505, 386 P.3d 567 (explaining the difference between an "as applied" constitutional challenge and a "facial" constitutional challenge). If we could sever the invalid part

¶112   Because § 13-13-114, MCA, does not impermissibly interfere with the right to vote but minimally burdens it, middle-tier analysis is appropriate.   The first step under our middle-tier analysis is to determine whether the Secretary has shown that the law is reasonable.   We determine that she has not.   The Secretary first posits that § 13-13-114, MCA, helps ensure that voters meet the Constitution's qualifications for voting.   However, the record reflects, and the Secretary's own procedures show, that the purpose of showing ID at the polls is not to check a voter's eligibility to vote, but to verify that they are who they say they are.   The Secretary asserts that a student ID is not indicative of a person's Montana residency.   But the Secretary admitted that a U.S. passport (which is a primary form of ID) is not either because it does not preprint a person's address.[31]   Neither is a military identification card indicative of Montana residency, though—like a student ID card—it is persuasive evidence of such.[32]   *See* § 13-1-112(3)(a), MCA ("An individual in the armed forces of the United States may not become a resident solely as a result of being stationed at a military facility in the state.").

---

of § 13-13-114, MCA, we would.  *See Greely*, 193 Mont. at 399, 632 P.2d at 311.  But we cannot sever the unconstitutional portion of the amended statute in this case because it would not place student ID back into a primary form of identification as it existed before.  Thus, the whole statute must fail and revert to § 13-13-114, MCA, as it was before the unconstitutional enactment.  *See Clark Fork Coal. v. Tubbs*, 2016 MT 229, ¶¶ 39–40, 384 Mont. 503, 380 P.3d 771.

[31] *Mont. Democratic Party*, ¶ 30, is abrogated to the extent it states that Montana concealed-carry permits are not required by Montana statute to bear a photograph.  *See* § 45-8-322(3), MCA ("The permit and each renewal must . . . at a minimum, include . . . a picture of the permittee.").   So although they are not uniform from county to county, each county must at a minimum include a picture of the applicant on the permit.

[32] We do not address in this Opinion whether a student identification card is sufficient evidence by itself of Montana residency to register to vote.  *See* § 13-1-112, MCA.

¶113 The Secretary asserts that § 13-13-114, MCA, eases administrative burdens by providing a clear list of primary IDs. We agree that having a list of acceptable primary IDs might help ease administrative burdens for poll workers. Thus, the person (often talked about at trial) who tries to use their Costco membership card or frequent flyer card at the polls will no longer confuse election judges as to whether that is an acceptable form of ID. But eliminating student IDs from the list of primary IDs did not ease administrative burdens as the Secretary asserts.

¶114 The Secretary argues that it was reasonable for the Legislature to draw a line between governmental and non-governmental IDs, suggesting at trial that student IDs from the Montana university system are "quasi-governmental IDs." The Montana university system is created by Article X, Section 9, of the Montana Constitution through the Board of Regents (Board) and governed by them. As such it is an entity of State government. Moreover, the Board's constitutional authority extends to rulemaking for administrative matters concerning the Montana university system. *Bd. of Regents*, ¶ 20. And the record shows that Montana university system schools all require a government photo ID to obtain a student ID, ensuring they are reliable. The record presents no evidence on student ID cards from private universities in Montana, nor are there facts cited to that are appropriate for judicial notice that suggests any standards less rigorous for other student IDs that used to be acceptable. Dissent, ¶ 168. Thus, although it is reasonable to draw a line between

governmental ID and a Costco card, it was not reasonable to remove student IDs from the list.[33]

¶115 The Secretary also argues that voter ID laws improve voter confidence, and it was therefore reasonable to enact this law. This again misstates the limited scope of our review of SB 169, which is to determine whether the removal of student IDs as primary forms of identification was reasonable. The record contains mixed evidence including a generalized conclusion from a State expert that voter ID laws improve confidence in elections. However, he later admitted that other research shows these types of laws have no effect on voter confidence or perceived rates of fraud. Appellees' experts concluded that the research shows these laws have no effect on voter confidence. The District Court found Appellees' experts persuasive and credible on this point. *See Marias Healthcare Servs. v. Turenne*, 2001 MT 127, ¶ 25, 305 Mont. 419, 28 P.3d 491 ("[A] district court is in a better position to observe witnesses and judge their credibility than this Court. We will not second guess a district court's determination regarding the strength and weight of

---

[33] We do not inexplicably ignore that the purpose of the ID law is to provide reliable proof of identity at the polls. Dissent, ¶ 168. Rather, that is a basis to conclude that the Secretary's argument that § 13-13-114, MCA, was necessary because it "ensur[ed] voters meet the Constitution's qualifications for voting" is arbitrary and unreasonable. *See* Opinion, ¶¶ 109, 112. What we also cannot ignore is that there was no evidence presented at trial that postsecondary education photo IDs are unreliable as a proof of identity. The only basis the State has to support that argument are citations to inapposite federal district court cases that upheld dissimilar laws under rational basis review—which is not the appropriate standard under the Montana Constitution's right to vote. Nor do we dispute the general wisdom of showing photo ID at the polls to verify identity. *Accord Crawford*, 553 U.S. 181, 128 S. Ct. 1610. Indeed, Montana has long required photo identification at the polls. *See* § 13-13-114, MCA (2003 Mont. Laws ch. 475, § 21). But, as with the other laws at issue here, when the Legislature amended § 13-13-114, MCA, to eliminate postsecondary education photo IDs as an acceptable form of primary photo identification, it was subject to constitutional constraints—here, under middle-tier analysis, that the law was reasonable and that the State's interests outweighed any burden the law created.

conflicting testimony nor substitute our judgment for that of the trial court when the issue relates to the credibility of the witness or the weight given to certain evidence.").

¶116 Under middle-tier analysis, the State must show that the law is reasonable—i.e., not arbitrary. *Butte Cmty. Union*, 219 Mont. at 434, 712 P.2d at 1314. In *Bartmess*, the State showed that its 2.0 rule was reasonable because it both (1) acted as an incentive for students wishing to participate in extracurricular activities to study and (2) provided adequate study time to those who did not meet the 2.0 average. *Bartmess*, 223 Mont. at 276, 726 P.2d at 805. In *Deaconess*, the State showed that its welfare rule was reasonable because those with an income 300% above that needed for general assistance could reasonably be expected to obtain their own insurance. *Deaconess Medical Ctr.*, 222 Mont. at 132–33, 720 P.2d at 1169.

¶117 Here, the State has not shown that, after almost two decades of allowing student IDs as primary forms of ID, its classification between student IDs and other primary forms of ID is reasonable. The classification did not ensure electors were qualified voters, ease administrative burdens, nor improve voter confidence.

¶118 Moreover, the Secretary has not demonstrated that the State's asserted interest is more important than the burden on the right to vote, which is required under the second step of middle-tier analysis. The above reasonableness analysis demonstrates that the Secretary's purported purposes carry little, if any, weight. The exclusion of a student ID as a primary form of identification for purposes of voting is unnecessary. As noted, evaluation of whether a person is a qualified elector is conducted in a separate registration process. As long as that person has been registered under Montana law, all they need to

do at the polls is to show that they are the person who has been duly registered. Although some forms of previously used identification may not be good indicators of someone's identity, a student ID issued by a postsecondary institution is.

¶119 Excluding student IDs from the list of acceptable photo IDs imposes a burden on student voting and the Secretary has not established that it is necessary for any legitimate government purpose, much less that it is more important than the right to vote. Nor is it a reasonable restriction of voter's rights. We hold that § 13-13-114, MCA, is unconstitutional.

## CONCLUSION

¶120 We affirm the District Court and hold that §§ 13-2-205(2), 13-2-304, and 13-13-114, MCA (2021), are unconstitutional. We also affirm the District Court and hold that 2021 Mont. Laws ch. 534, § 2, is unconstitutional.


/S/ MIKE McGRATH


We Concur:

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON


Justice Ingrid Gustafson, concurring.

¶121 While I join in the Opinion and concur with its conclusion affirming the District Court and holding §§ 13-2-205(2), 13-2-304, and 13-13-114, MCA (2021), are unconstitutional, I do not agree with the application of middle-tier scrutiny with regard to

issue one—restricting a voter from receiving or submitting an absentee ballot if the voter would be eligible to vote on or before election day but were not yet eligible to vote.

¶122   As the Opinion underscores, under the Montana Constitution, "the right to vote is a clear and unequivocal fundamental right," Opinion, ¶ 13, and "when a law impermissibly interferes with a fundamental right, we apply a strict scrutiny analysis."  Opinion, ¶ 34, citing *Wadsmorth v. State*, 275 Mont. 287, 302, 911 P.2d 1165, 1173-74 (1996).  As pointed out by the Opinion, absentee voting has become the predominate voting by electors in Montana—accounting for nearly 75% of the voting in 2018 and the *only* means of voting in 2020.  Opinion, ¶ 52.  I would conclude § 13-2-205(2), MCA—that precludes the predominate voting option, and at times precludes all voting options, eliminating voting for the subclass it effects—is more than a mere burden on voting.  I would conclude the total or near total elimination of voting options for the subclass it effects impermissibly interferes with the right to vote and is thus subject to strict scrutiny.

¶123   As § 13-2-205(2), MCA, does not pass the lessor middle-tier analysis, it clearly does not pass strict scrutiny.

/S/ INGRID GUSTAFSON

Justice Laurie McKinnon joins in the concurring Opinion of Justice Gustafson.

/S/ LAURIE McKINNON

Justice Beth Baker, concurring in part and dissenting in part.

¶124 I join all but ¶¶ 48-61 of the Court's Opinion. In my view, the Plaintiffs did not meet their burden to establish the facial invalidity of HB 506, amending § 13-2-205, MCA. That amendment makes clear that, although a person may register to vote if they will be 18 on or before election day, they may not receive or cast a ballot until they meet "residence and age requirements[.]" Section 13-2-205(2), MCA. The Court acknowledges that this law does not interfere with the right to vote, as by its terms it prevents no one from voting and by its operation did not—according to any record evidence—prevent anyone from voting. Opinion, ¶ 51. It concludes nonetheless that because the law removes the option of absentee voting for this subclass of eligible voters, it burdens their right, for which the State has not shown an important government interest. Opinion, ¶¶ 51, 59. Applying middle-tier scrutiny to HB 506 and measuring the nature of the intrusion against the government interest served by the amendment, I disagree.

¶125 Under Article IV, § 2 of the Montana Constitution, a person is not a qualified elector until age 18. The new law affects a very narrow subset of potential voters—those who turn 18 within the month before an election—and removes their absentee-voting option for the single election for which the voter is not qualified to cast a ballot prior to the mailing of absentee ballots (twenty-five days before election day). This brings the Plaintiffs' constitutional challenge closer to an as-applied than a facial challenge, as the law plainly is constitutional in most of its applications. Beyond that, it imposes an extremely minimal burden to the extent it impacts a voter only on the first election for which they are eligible.

65

¶126 As the Secretary points out, before its enactment, Montana law lacked uniformity for when absentee ballots could be distributed to those who had not yet reached voting age. The State presented evidence that county election administrators made their own individual decisions and treated prospective voters differently on a county-by-county basis. This led to inconsistency among different communities in how voters were being treated and in how ballots were being handled before a voter was qualified. Some counties mailed absentee ballots to these voters, and some did not. If the ballots were returned, some would hold them until election day; other counties cautioned the voters not to return them until they were eligible to vote. Of all the laws challenged, this one is a modest time, place, and manner regulation for which the State has shown a legitimate interest. *See Butte Cmty. Union*, 219 Mont. at 434, 712 P.2d at 1314. Because the regulation does not interfere with the fundamental right to vote, the State was not required to show that it was narrowly tailored or that the government's interests could have been achieved by less restrictive means. By establishing a uniform, statewide regulation effecting a one-time limitation on a narrow class of electors, the Legislature acted within its constitutional authority to provide by law for registration and absentee voting. Mont. Const. art. IV, § 3.

¶127 Were it not for the "final safeguard" of election-day registration (Opinion, ¶ 71), § 13-2-205(2), MCA, could impose a more substantial burden on this narrow group of first-time voters, and the Plaintiffs' case would be stronger. But the Court's Opinion today removes that concern. Accordingly, I would not disturb the Legislature's choice on this issue.

/S/ BETH BAKER

66

Justice Dirk Sanderfur concurring in part, dissenting in part.

¶128   I concur that § 13-2-205(2), MCA (2021) (barring preliminary issuance of absentee ballots to voters who will be 18 years old on or before election day), is facially unconstitutional.   Whether under rational basis scrutiny or the correct standard of intermediate scrutiny, it is not rationally related to the Legislature's stated purpose under Mont. Const. art. IV, § 3 (legislature duty to regulate voting residence/registration, absentee voting, and election administration to "insure the purity of elections and guard against abuses of the electoral process"), of providing for efficient election administration, preventing voter fraud, and otherwise ensuring the integrity of the election process.

¶129   I dissent, however, from the Court's analysis and resulting conclusions that the Legislature's push-back of the voter registration deadline from election day to noon the day before (§ 13-2-304, MCA (2021)), prohibition of paid third-party absentee ballot collectors (2021 Mont. Laws ch. 534, § 2),[1] and elimination of university student IDs as an acceptable form of "primary" voter identification (§ 1-13-114, MCA (2021)) are facially unconstitutional.   Legislative enactments are facially unconstitutional only if there are no conceivable circumstances under which the enactment may constitutionally apply under the applicable level of constitutional scrutiny.   *Mont. Cannabis Indus. Ass'n v. State*, 2016 MT 44, ¶¶ 14 and 73, 382 Mont. 256, 368 P.3d 1131 (*inter alia* citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449, 128 S. Ct. 1184, 1190 (2008) (citing

_____

[1] As a technical matter, 2021 Mont. Laws ch. 534, § 2 does not directly prohibit paid absentee ballot collectors, but nonetheless does so indirectly by directing administrative prohibition of paid absentee ballot collectors.

*United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987))).[2]  Without

reference to that critical threshold principle, the Court erroneously avoids the correct level

of intermediate constitutional scrutiny for time, place, and manner voting and election

administration regulations that do not substantially interfere with the right to vote, as

recognized in *Burdick v. Takushi*, 504 U.S. 428, 112 S. Ct. 2059 (1992) (citing *Anderson

v. Celebrezze*, 460 U.S. 780, 786-98, 103 S. Ct. 1564, 1569-75 (1983)), and as applied in

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 128 S. Ct. 1610 (2008).  The Court

does so based on:

   (1)   a demonstrably false assertion that the Montana Constitution "affords greater protection of the right to vote than the United States Constitution," *inter alia* because the fundamental right to vote protected under the United States Constitution was "much stronger" in 1972 "than it is today";

   (2)   the resulting misleading assertion that the Supreme Court's *Burdick/Anderson* intermediate scrutiny standard does not apply here due to the greater protection of the right provided by Mont. Const. art. II, § 13;

   (3)   the equally unsupported and thus misleading assertions that the *Burdick/Anderson* standard also does not apply here because it is *not as* "*meaningful*" as it once was and "now provides less protection" of the right to vote;

   (4)   erroneous application of strict scrutiny to the Legislature's push-back of the voter registration deadline from election day to noon the day before (§ 13-2-304, MCA (2021)), and prohibition of paid third-party ballot collectors (2021 Mont. Laws ch. 534, § 2), based on clearly erroneous findings of fact that those measures *substantially interfere* with, rather than merely reasonably burden, the exercise of the right to vote; and

---

[2] A legislative enactment may alternatively be facially unconstitutional upon a challenging party showing that it is overbroad because a "substantial number of its applications" fail the applicable level of constitutional scrutiny with no "plainly legitimate sweep."  *See Wash. State Grange*, 552 U.S. at 449 n.6, 128 S. Ct. at 1190 (citing *New York v. Ferber*, 458 U.S. 747, 769-71, 102 S. Ct. 3348, 3361-62 (1982), internal punctuation omitted).

(5) amorphous ad hoc application of an analytically incompatible standard of intermediate constitutional scrutiny to the elimination of state university student ID cards as an authorized form of primary voter ID, instead of the manifestly applicable *Burdick*/*Anderson* standard of intermediate scrutiny specifically tailored to voting/election administration regulations that do not substantially interfere with the exercise of the right to vote.

*See* Opinion, ¶¶ 15, 17-19, 21-28, 32, 62-75, 95-96, 101, and 109-119 (emphasis added); *compare Crawford*, 553 U.S. at 185-204, 128 S. Ct. at 1613-24 (applying *Burdick*/*Anderson* intermediate scrutiny in rejecting state Democratic Party assertion that Indiana statute requiring photo ID at the polls "substantially burdens the right to vote" in violation of U.S. Const. amend. XIV because it was "[un]necessary" to "avoid[] election fraud," would "arbitrarily disfranchise qualified voters who do not" have the required photo ID, and would "place an unjustified burden on those who cannot readily obtain such identification").

1. Demonstrably False Assertion that Montana Constitution "Affords Greater Protection of the Right to Vote" than United States Constitution.

¶130 The lynchpin to the Court's cascading analytical sleight of hand is the erroneous assertion that the fundamental right to vote guaranteed by Mont. Const. art. II, § 13 ("no power . . . shall at any time interfere to prevent the free exercise of the right of suffrage"), "affords greater protection of the right to vote than the United States Constitution." Opinion, ¶¶ 17 and 19-20. As a threshold matter, it is hard to imagine how the Framers of our 1972 Constitution intended to provide greater protection of voting rights than provided under the United States Constitution when they did nothing more than carry forward, verbatim, the same language from our 1889 Constitution without discussion, or controversy. *See* Mont. Const. art. II, § 13; *compare* 1889 Mont. Const. art. III, § 5. *See*

69

*also* Montana Constitutional Convention, Committee Proposals, Feb. 18, 1972, Vol. II, p. 634 (Bill of Rights Committee), and Verbatim Transcript, March 8, 1972, Vol. V, p. 1745 (final approval). Unlike the various individual rights uniquely enshrined in a federal or state constitution for the first time in our 1972 Constitution, e.g., Mont. Const. art. II, §§ 3-4, 8-10, and 15 (rights to clean and healthful environment, individual dignity, participation in governmental activities, examine documents and observe deliberations of public bodies or agencies, individual privacy, and fundamental rights of minors), the right to vote was already a broad-scope implicit fundamental right under the United States Constitution in 1972, and neither the express language of Mont. Const. art. II, § 13, nor its constitutional history, manifests any intent of the Framers to provide a broader or more protective right to vote under the Montana Constitution.

¶131 Straining to support its cursory assertion that Mont. Const. art. II, § 13, provides "greater protection" of the right to vote than the federal constitution, the Court cites isolated statements made by a few individual Delegates to the 1972 Constitutional Convention. Opinion, ¶ 27 (quoting Montana Constitutional Convention, Verbatim Transcript, Feb. 17, 1972, Vol. III, pp. 401-02, 409, and 445 ("the act of voting is not a privilege that the state merely hands out, but it is a basic right . . . that in no way should be infringed unless for very good reasons"; the "right to vote is so sacred and . . . important that it deserves constitutional treatment"; the "only way to preserve the rights of the public is to preserve their vote" because its "the only power the public has"; and "the right to vote is certainly the most sacred right of them all"). The Court selectively cherry-picked each of those

70

isolated statements, along with others,[3] out of the distinct context in which they were made—the midst of a significant running debate as to whether Mont. Const. art. IV, § 3, should enshrine an explicit right to "poll booth" registration (election day voter registration) into the new Constitution, or alternatively, leave that issue to the *discretion of the Legislature* as was ultimately decided. *See* Montana Constitutional Convention, Verbatim Transcript, Feb. 17, 1972, Vol. III, pp. 400-14 and 428-53.[4] Even on that narrow subject, the isolated statements cited in Opinion, ¶¶ 27 and 68, came from individual Delegates who originally advocated in favor of the minority proposal *before* ultimately *joining the majority vote against it*. *See* Montana Constitutional Convention, Verbatim Transcript, Feb. 17, 1972, Vol. III, pp. 401-02, 406, 409, 412-13, 437, and 445 (individual statements and votes of Delegates Vermillion, Campbell, Choate, Dahood, Holland, and McKeon initially in support of minority proposal to make election day registration a constitutional right); *compare* Montana Constitutional Convention, Verbatim Transcript, Feb. 17, 1972, Vol. III, pp. 451-52 (76-22 final vote approving ultimately adopted language of Mont. Const. art. IV, § 3, and thus rejecting minority proposal to make election day registration a constitutional right). While many, but certainly not all, of the Delegates who participated in the debate favored election day registration as a means to increase voter turnout, *see* Montana Constitutional Convention, Verbatim Transcript, Feb. 17, 1972,

---

[3] Opinion, ¶ 68 (citing various other statements made by individual Delegates in support of *ultimately-rejected minority proposal* to enshrine election day registration as a constitutional right in contravention of then-prevailing 40-day statutory election deadline).

[4] *See also* Montana Constitutional Convention, Verbatim Transcript, March 1, 1972, Vol. IV, p. 1185 (Mont. Const. art. IV, § 3, in current form).

Vol. III, pp. 400-14 and 428-53, an overwhelming 76-22 majority of the Delegates as a whole could have, but squarely chose *not* to make election day registration a Montana constitutional right, even in the face of the then prevailing 40-day statutory voter registration deadline. Read objectively as a whole, rather than through the distorted lens of isolated statements of individual Delegates regarding an only tangentially related matter, nothing in the pertinent history of the Montana Constitutional Convention supports the Majority's naked assertion here that the Framers intended to have the Montana Constitution provide greater protection of the right to vote than the already broad protection then provided under the United States Constitution.

¶132 Moreover, we have long recognized that Constitutional Convention transcripts are not necessarily "indicative of" the Framers' intent regarding the interpretive matter at issue because statements of individual Delegates do not necessarily reflect the "collective intent" of the majority of the body. *Keller v. Smith*, 170 Mont. 399, 408-09, 553 P.2d 1002, 1008 (1976); *Columbia Falls Elem. Sch. Dist. v. State*, 2005 MT 69, ¶ 64, 326 Mont. 304, 109 P.3d 257 (Rice, J., specially concurring). As manifest by the Majority's selective cherry-picking here, the isolated "excerpted" statements of individual Delegates "can often be used to support almost any position," *State ex rel. Racicot v. First Judicial Dist. Ct.*, 243 Mont. 379, 387, 794 P.2d 1180, 1184 (1990), whether a majority of the body acted to "address the specific problem involved in [a particular] case" or not. *Keller*, 170 Mont. at 408-09, 553 P.2d at 1008.

¶133 In historical context, it bears further note that the voter registration deadline left in place when the Framers rejected enshrining election day registration in the Constitution

was 40 days before election day[5]—a far cry from the 32-hour deadline the Court declares unconstitutional today.  The then-prevailing 40-day registration deadline was *left in place by the Framers*, the *very same body* the *Court today cursorily alleges* intended greater protection of the right to vote than provided under the United States Constitution.  Even in the ensuing 35 years before enactment of election day registration in 2005,[6] the voter registration deadline was still 30 days before election day[7]—a deadline thus *clearly constitutional*, at least *in the minds and resulting acts of the Framers*.

¶134   Though the federal right is manifestly implied primarily from the First Amendment, there simply can be no doubt that our Framers' were aware of the United States Supreme Court's clear, unequivocal, and consistently broad and strong protection of the fundamental right of all citizens to vote under the United States Constitution, to wit:

> The right to vote freely for the candidate of one's choice is of the *essence of a democratic society*, and any restrictions on that right strike *at the heart of representative government*. . . . Undoubtedly, the right of suffrage is a *fundamental matter* in a free and democratic society.  *Especially since* the right to exercise the franchise in a free and unimpaired manner is *preservative of other basic civil and political rights*, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

*Reynolds v. Sims*, 377 U.S. 533, 555 and 561-62, 84 S. Ct. 1362, 1378 and 1381 (1964) (emphasis added); *Wesberry v. Sanders*, 376 U.S. 1, 17-18, 84 S. Ct. 526, 535 (1964) ("[n]o right is more precious in a free country than that of having a voice in the election of those

---

[5] Section 23-3016(1)(a), RCM (1947) (1969 Mont. Laws ch. 368, § 35).

[6] 2005 Mont. Laws ch. 286, § 1.

[7] *See* § 13-2-301(1)(a), MCA (2003).

who make the laws under which, as good citizens, we must live"—"[o]ther rights, even the most basic, are illusory if the right to vote is undermined"); *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S. Ct. 1064, 1071 (1886) ("political franchise of voting" is "*a fundamental political right*" because it is "*preservative of all rights*"—emphasis added). *See similarly Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S. Ct. 983, 990 (1979) ("voting is of the most fundamental significance under our constitutional structure").[8]

¶135  Obviously aware that the legitimacy of its ensuing analyses of the Legislature's disputed time, place, and manner voting regulations critically and precariously depends on its unsupported assertion that the Montana Constitution provides greater protection of the right to vote than the United States Constitution, the Majority strains hard to undermine this Dissent demonstration to the contrary. Opinion, ¶¶ 15, 17, and 19-27. Upon close examination, however, the Majority analysis actually bolsters this Dissent analysis. Most importantly, the Court's Opinion ultimately fatally wounds itself when forced to acknowledge that the protection of the fundamental right to vote manifestly implicit in the United States Constitution was every bit as broad and strong in 1889 and 1972 as the protection of the right similarly expressed in both our original and current Montana Constitutions. *See* Opinion, ¶ 22. Having acknowledged the indisputable, the Majority then cites to a slew of U.S. Supreme Court cases, including those cited *supra*, for the

---

[8] Further manifesting the strong, broad, and consistent protection of the implicit fundamental right to vote under the United States Constitution are those related express protections provided long before 1972. *See* U.S. Const. amends. XIV, XV, and XIX (expressly guaranteeing the right to "equal protection of the laws" and expressly providing that the right of United States citizens "to vote shall not be denied or abridged by" the federal or any state government based on "race, color, . . . previous condition of servitude," or gender).

proposition that the fundamental right to vote protected by the United States Constitution "was viewed much stronger in the 1800s through the 1970s than . . . today." Opinion, ¶ 22. The Majority conspicuously fails, however, to cite a single instance, not one, where the Supreme Court has expressly or implicitly given *any* indication that it views the protection of the right to vote under the United States Constitution to be narrower or weaker today than in the 1800s through the 1970s. Opinion, ¶¶ 15, 22, 27, and 30.

¶136 The Majority punctuates its unsupported assertion of stronger protection of the right to vote under Mont. Const. art. II, § 13, by concluding that the Framers "clearly intended to strongly protect the right to vote as seen through" its plain language and history, "the Constitution as a whole, and the Framers' discussion" regarding Mont. Const. art. IV, § 3.[9] Opinion, ¶¶ 26-27. Unquestionably, our Framers clearly intended Mont. Const. art. II, § 13, as carried forward verbatim from our 1889 Constitution, to "retain" and "maintain" a "strong and protective" right to vote.[10] But, again, conspicuously absent from the Majority's repeated reliance on that point is citation to *any* non-speculative manifestation of our Framers' intent, whether collectively or even based on isolated statements of *any* individual Delegate, to provide greater or broader protection than already provided by the United States Constitution.

---

[9] Mont. Const. art. IV, § 3 ("[t]he legislature shall provide by law the requirements for residence, registration, absentee voting, and administration of elections . . . and *shall* insure the purity of elections and guard against abuses of the electoral process).

[10] *Accord* Opinion, ¶¶ 27, 27 n.5, 33, and 35.

¶137 Faced with that vexing analytical shortcoming, the Court cites *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 142 S. Ct. 2228 (2022) (overruling *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705 (1973)), for the proposition that implicit rights protected by the United States Constitution "are subject to expansion [and] contraction." Opinion, ¶ 21. However, without laying out the complexities of the debate as to whether the Fourteenth and Tenth Amendments to the United States Constitution imply a privacy right inclusive of a woman's right to choose a pre-viability abortion, suffice it to say that the Majority puts forth here no more than an intentionally over-simplified characterization of those federal bodily/reproductive privacy rights cases to support an unrelated and otherwise unsupported construction of Mont. Const. art. II, § 13.[11] Moreover, even if the Majority's proposition regarding the elasticity of implicit federal constitutional rights is taken *arguendo* as accurate, its pivotal point still fails because, in contrast to the historical debate over abortion rights, the United States Supreme Court has steadfastly recognized and protected the fundamental right to vote in a consistent, clear, and unequivocal manner throughout the entirety of our tumultuous national history. *See, e.g.*, *supra*, *Ill. Bd. of Elections*, 440 U.S. at 184, 99 S. Ct. at 990; *Reynolds*, 377 U.S. at 555 and 561-62, 84 S. Ct. at 1378 and 1381; *Wesberry*, 376 U.S. at 17-18, 84 S. Ct. at 535; *Yick Wo*, 118 U.S. at 370, 6 S. Ct. at 1071.[12]

---

[11] Rather than a demonstrably broad legal point, the Majority's overly-simplistic *Dobbs-Roe* elasticity assertion is seemingly more of an opportunistic political comment made to overcome an inconvenient analytical obstacle to a desired end. What future implication it may portend regarding the similar hot-button question of whether Mont. Const. art. II, § 10 (individual right to privacy) is or will remain implicitly or necessarily inclusive of a woman's right to choose a pre-viability abortion remains to be seen.

[12] *See also Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 86 S. Ct. 1079 (1966) (holding that state poll tax substantially interfered with the fundamental U.S. constitutional right to vote and

The Majority cites no Supreme Court authority to the contrary, and the suggestion of any future likelihood of such a United States Supreme Court holding in the voting rights context is, in a word, preposterous given the Court's unwavering protection of the federal right. Nor has the Majority cited even a single shred of Montana Constitutional Convention history indicating that even a single Delegate, much less the body as whole, intended or even contemplated that inclusion of Mont. Const. art. II, § 13, as carried forward verbatim from our 1889 Constitution, was necessary to protect against any future elasticity in Supreme Court interpretation of the fundamental right to vote so long protected under the United States Constitution. Over a half century later, the Majority simply conjures that speculative justification from thin air.

¶138 Under these circumstances, there can be no doubt that the Framers of our new Constitution expressed no concern, need, or intent to provide greater protection of the right to vote than that already provided under the United States Constitution. The Majority's disregard of our own state constitutional history, the express language of the United States Constitution, and the Supreme Court's well-settled recognition of a clearly implied and broad fundamental federal constitutional right to vote is not only the result of faulty constitutional analysis, but shocking to say the least. Clearly, neither the text nor history of Mont. Const. art. II, § 13, support the Court's pivotal unsupported assertion here that the Montana Constitution provides greater protection of the fundamental right to vote than the United States Constitution.

---

further failed strict scrutiny in violation of Fourteenth Amendment equal protection because it was irrelevant to a voter's qualification to vote).

¶139 Equally of no avail, the Court attempts to further support its pivotal cursory assertion of a more protective Montana constitutional right by pointing out that, unlike the United States Constitution, the Montana Constitution expressly protects the right to vote. Opinion, ¶¶ 16-20. The Court then cites the well settled but non-dispositive point of law that nothing in the United States Constitution prevents states, *through their adopting citizenry*, from providing even greater protection of individual rights than provided under the United States Constitution. *See* Opinion, ¶ 16. However, conspicuously absent from the Court's analysis is any explanation how, on what basis, or even to what extent Mont. Const. art. II, § 13, *merely by express statement* of a fundamental right to vote, provides any greater protection than the above-noted broad protection provided under the United States Constitution. Of course state courts are "entirely free to read [their] own State's constitution more broadly than [the Supreme] Court reads the [United States] Constitution, or to reject the mode of analysis used by [the Supreme] Court in favor of a different analysis of its corresponding constitutional guarantee." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 293, 102 S. Ct. 1070, 1077 (1982). We have thus often recognized that:

> [we are not] compelled to "march lock-step" with federal courts. *States* are free to grant citizens greater protections *based on state constitutional provisions* than the United States Supreme Court divines from the United States Constitution. As long as we guarantee the minimum rights established by the United States Constitution, we are not compelled to march lock-step with pronouncements of the United States Supreme Court *if our own constitutional provisions call for more* individual . . . *protection* than that guaranteed by the United States Constitution.

*State v. Hardaway*, 2001 MT 252, ¶ 31, 307 Mont. 139, 36 P.3d 900 (internal citations omitted, emphasis added). However, as manifest in our own above-emphasized *Hardaway*

78

language, we are free to interpret the Montana Constitution to provide greater protection than similar protections provided by the United States Constitution, but *only if* the express language or interpretive constitutional history *clearly* manifests a *Framers' intent* to provide greater protection. *See Hardaway*, ¶ 31. In other words, we are free of federal constitutional constraint to interpret our state constitutional protections more expansively than the lower federal constitutional floor, *but only when* the subject Montana constitutional provision has a *discernably different meaning or greater scope* based on *its unique language or constitutional history*. *See, e.g.*, *State v. Staker*, 2021 MT 151, ¶ 23, 404 Mont. 307, 489 P.3d 489 (noting heightened privacy protection provided by Mont. Const. art. II, §§ 10-11 (right to privacy and freedom from unreasonable searches and seizure) based on express right to privacy *and particular discernable concern of Framers* with government intrusion through modern electronic surveillance); *State v. Zeimer*, 2022 MT 96, ¶ 23 n.13, 408 Mont. 433, 510 P.3d 100 ("[a]part from the implicit privacy protection provided by the Fourth Amendment and similar language of Mont. Const. art. II, § 11," Mont. Const. art. II, § 10 expressly protects right to "individual privacy" against government intrusion and thus provides "broader privacy protection, where implicated, than the Fourth Amendment" based on Framers' "special privacy concerns"); *State v. Peoples*, 2022 MT 4, ¶¶ 12-14, 407 Mont. 84, 502 P.3d 129 (noting recognition of certain more limited warrantless search and seizure exceptions under Mont. Const. art. II, §§ 10-11 than under U.S. Const. amends. IV and XIV); *Yellowstone Cty. v. Billings Gazette*, 2006 MT 218, ¶ 39, 333 Mont. 390, 143 P.3d 135 (noting broad scope of rights to know and public participation expressed in Mont. Const. art. II. §§ 8-9, predicated on special concern

of Framers to ensure "openness of government documents and operations"); *Engrav v. Cragun*, 236 Mont. 260, 262, 769 P.2d 1224, 1226 (1989) (noting Framers' concern and intent, embodied in Mont. Const. art. II, §§ 9-10, to strike a balance between right to individual privacy and public right to know in re government and government officer activities); *Nelson v. City of Billings*, 2018 MT 36, ¶¶ 14-15, 390 Mont. 290, 412 P.3d 1058 ("[e]ven in the context of clear and unambiguous language" we must construe the meaning and application of Montana constitutional provisions "not only from the plain meaning of the language used, but also in light of the historical and surrounding circumstances under which the Framers drafted the Constitution, the nature of the subject matter they faced, and the objective they sought to achieve" with recognition that *our Constitution was not developed and adopted in a vacuum on a blank slate but "assume*[*d*] *the existence of a well understood system of law* which is still to remain in force and to be administered" within the parameters of the new constitution—we must thus "examine[] [those] concepts in the context of the [prior] history of this [State] and the well-understood system" of laws that predated the new constitution—internal punctuation and citations omitted, emphasis added). Certainly, the explicit provision of new fundamental rights, not previously expressed in our prior 1889 Constitution, or clearly recognized under the United States Constitution, may alone manifest the Framers' intent to explicitly provide greater protection than provided under the United States Constitution. *See, e.g.*, Mont. Const. art. II, §§ 3-4, 8-10, and 15 (rights to clean and healthful environment, individual dignity, participation in governmental activities, examine documents and observe deliberations of public bodies or agencies, individual privacy, and fundamental rights of minors). Not so,

however, when, as here, a right explicit in the new Montana Constitution was no more than a verbatim carry-over from our 1889 Constitution, which was in turn developed and drafted against the backdrop of long-established rights protected under the United States Constitution without any manifestation of a different Framers' intent in 1889, much less in 1972. *See Nelson*, ¶¶ 14-15, *supra*.

¶140 Moreover, neither our exclusive grant of judicial power under Mont. Const. art. VII, §§ 1-2, nor our included exclusive constitutional power and duty to review legislative enactments for constitutional conformance, gives us unfettered discretion, as exercised by the Majority here in the absence of any distinct supporting Montana constitutional language or history, to construe a Montana constitutional right to provide broader protection than a corresponding federal constitutional right *based on no more than our unsupported declaration*. *See Larson v. State*, 2019 MT 28, ¶ 42, 394 Mont. 167, 434 P.3d 241 ("[*w*]*ithin constitutional limits*" this Court has "exclusive authority and duty to adjudicate the nature, meaning, and extent of applicable constitutional, statutory, and common law and to render appropriate judgments thereon in the context of cognizable claims of relief"—emphasis added). More plainly, explicit Montana constitutional rights are *not merely empty vessels to be filled by this Court at our unrestrained whim* over a half century later, in the absence of a supporting textual basis or supporting basis in constitutional history clearly manifesting the collective intent of the Framers as a whole. Thus, the Majority's assertion that the Montana Constitution provides greater protection of the right to vote than the United States Constitution is demonstrably false as a matter of law.

2. Erroneous Application of Strict Scrutiny and Fallacious Disregard of Clearly Applicable *Burdick/Anderson* Intermediate Scrutiny of Non-Discriminatory Time, Place, and Manner Voting Regulations Under Mont. Const. art. II, § 13.

¶141 Even in the absence of a fundamental Montana constitutional right that provides greater protection than the United States Constitution, the Court apparently asserts here that we are still free at our whim to independently interpret Montana constitutional rights to provide broader protection than corresponding federal constitutional rights. *See* Opinion, ¶ 16 (citing *State v. Guillaume*, 1999 MT 29, ¶ 15, 293 Mont. 224, 975 P.2d 312). *Guillaume* and a few other similar decisions of this Court over the years seemingly support that proposition. *See, e.g.*, *Guillaume*, ¶ 15. However, *Guillaume* and similar decisions are distinguishable, if not anomalously erroneous, insofar that they were based on nothing more than our unsupported declaration of such greater protection, and because the constitutional bases for those unsupported declarations was simply not at issue in those cases. *See, e.g.*, *Guillaume*, ¶ 15.

¶142 Anomalies aside, we *are* free, as noted *supra*, to interpret Montana constitutional rights to provide greater protection than corresponding protections provided under the United States Constitution, but we clearly have done so, despite repeated invitation, *only when* based on a textual or historical manifestation of such Framers' intent. Absent a clearly discernible manifestation of the Framers' *collective intent* to provide greater state protection, we have generally construed Montana constitutional rights to be coextensive with similar rights provided or protected under the United States Constitution. *See City of Bozeman v. McCarthy*, 2019 MT 209, ¶ 14 n.4, 397 Mont. 134, 447 P.3d 1048 (noting that our interpretations of a criminally "accused's due process and confrontation rights" under

82

Mont. Const. art. II, §§ 17 and 24 are "in substantial accord with federal due process standards" under U.S. Const. amend. XIV); *State v. Covington*, 2012 MT 31, ¶¶ 15-25, 364 Mont. 118, 272 P.3d 43 (rejecting assertion that distinct language of Mont. Const. art. II, §§ 24 and 26 (right to jury trial) provides broader protection than Sixth Amendment right to jury trial insofar that it "requires that any fact used to enhance a sentence beyond a statutory maximum, including prior convictions, must be submitted to the jury"— defendant "failed to articulate how his claim implicate[d] any enhanced right afforded under the Montana Constitution" and "cite[d] nothing in" Constitutional Convention transcripts indicating that Framers "contemplated some enhanced protection" regarding the issue); *Buhmann v. State*, 2008 MT 465, ¶ 64, 348 Mont. 205, 201 P.3d 70 (construing Mont. Const. art. II, § 29 "taking" of private property protection to be "coextensive with" the Fifth Amendment "taking" protection and thus Fifth Amendment "takings analysis . . . is to be applied to takings claims whether brought under the U.S. or Montana constitutions"); *State v. Schneider*, 2008 MT 408, ¶¶ 11-23, 347 Mont. 215, 197 P.3d 1020 (Mont. Const. art. II, § 24 (right to counsel in "criminal prosecutions") provides no broader protection than Sixth Amendment right to counsel as interpreted by Supreme Court and is thus similarly an offense-specific trial right that attaches only at "critical" stage of a prosecution—no textual basis or manifestation in Convention Transcripts provided any basis upon which to conclude that Framers intended to provide broader protection under Montana Constitution); *State v. Goetz*, 2008 MT 296, ¶¶ 33-35, 345 Mont. 421, 191 P.3d 489 (Mont. Const. art. II, §§ 10-11 provide enhanced protection against electronic monitoring due to Framers' articulated concerns regarding technological infringement of

individual privacy); *Kafka v. Mont. Dep't of Fish, Wildlife & Parks*, 2008 MT 460, ¶ 30, 348 Mont. 80, 201 P.3d 8 (Fifth Amendment "Takings Clause" (private property shall not "be taken for public use without just compensation") and Mont. Const. art. II, § 29 ("[p]rivate property shall not be taken or damaged for public use without just compensation to the full extent of the loss having been first made to or paid into court") differ slightly but we "generally look[] to federal case law for guidance when considering a [Mont. Const. art. II, § 29] takings claim" as do "other jurisdictions which have" state constitutions with "similar or identical" provisions—noting that "plain language of Article II, Section 29 is not unique among state constitutions"—citations omitted); *Walker v. State*, 2003 MT 134, ¶¶ 52-56, 73-75, 81, and 84, 316 Mont. 103, 68 P.3d 872 (Mont. Const. art. II, § 22 (protection against cruel and unusual punishment) is coextensive with Eighth Amendment right against cruel and unusual punishment except to the extent that Montana-unique Mont. Const. art. II, § 4 (right to human dignity), in tandem with art. II, § 22, affords greater protection than Eighth Amendment alone); *State v. Bassett*, 1999 MT 109, ¶ 42, 294 Mont. 327, 982 P.2d 410 ("Montana's unique constitutional scheme" under Mont. Const. art. II, §§ 10-11 "affords citizens broader protection of their right to privacy than does the Fourth Amendment to the United States Constitution"); *City of Helena v. Danichek*, 277 Mont. 461, 463-68, 922 P.2d 1170, 1172-75 (1996) (Mont. Const. art. II, § 25 (double jeopardy protection) is coextensive with Fifth Amendment double jeopardy protection under interpretive Supreme Court authority); *City of Helena v. Krautter*, 258 Mont. 361, 363-66, 852 P.2d 636, 638-40 (1993) (Mont. Const. art. II, § 7 (right to free speech and expression) "provides no greater protection for free expression than does" First Amendment—"if

[Montana] trespass statute is constitutional under the First Amendment" jurisprudence as applied to abortion clinic protesters it is then similarly "constitutional under Art. II, § 7"); *City of Billings v. Laedeke*, 247 Mont. 151, 155-58, 805 P.2d 1348, 1351-52 (1991) (Mont. Const. art. II, § 7 (right to free expression) provides no "greater state protection of nude and semi-nude dancing" in licensed establishments than the First Amendment); *State v. Jackson*, 206 Mont. 338, 341-48, 672 P.2d 255, 256-60 (1983) (Mont. Const. art. II, § 25 (right against self-incrimination in "criminal proceedings") provides no greater protection than U.S. Const. amend. V (right against self-incrimination in criminal cases) because substantively similar language and no distinct constitutional history "affords no basis for interpreting" Montana right "more broadly than its federal counterpart"—admission of blood-alcohol test refusal against DUI defendant under implied consent statute thus not violative of Montana constitutional right against self-incrimination); *State v. Armstrong*, 170 Mont. 256, 260-61, 552 P.2d 616, 618-19 (1976) (Mont. Const. art. II, § 25 (Montana right against self-incrimination in "criminal proceedings") provides "no greater protection" than Fifth Amendment right against self-incrimination); *State v. Anderson*, 156 Mont. 122, 125, 476 P.2d 780, 781-82 (1970) (1889 Mont. Const. art. III, § 18 (right against self-incrimination) "affords . . . no greater protection than" Fifth Amendment). We do so not because the United States Constitution controls or limits our interpretation of independent state grounds for more expansive state law protection, but because the absence of any clear manifestation of contrary Framers' intent indicates that the Framers understood and intended that our state constitution would similarly provide coextensive protection as

85

an independent matter of state law *as persuasively guided by* Supreme Court interpretation of those coextensive rights and protections under the United States Constitution.

¶143 Viewed in context of those principles and our prior decisions, the Majority's cursory dismissal of the *Burdick*/*Anderson* standard of intermediate scrutiny as one that "often gives undue deference to state legislatures so as not to 'transfer . . . authority to regulate [state] election procedures . . . to the *federal* courts,'" is puzzlingly non sequitur and misleading. *See* Opinion, ¶ 15 (citing *Brnovich v. Democratic Nat'l Committee*, ___ U.S. __, __, 141 S. Ct. 2321, 2341 (2021), and *Crawford*, 553 U.S. at 204-05, 128 S. Ct. at 1624-25 (Scalia, J., concurring)). In context, nothing in *Brnovich* states or even suggests that the Supreme Court now views, or has ever viewed, the *Burdick*/*Anderson* standard of immediate scrutiny to be diluted-down, less meaningful, more deferential to state courts, or an effective transfer of voting or election administration authority from States to federal courts. The isolated statement cherry-picked here by the Majority out of context from *Brnovich* appears in the midst of a recent Supreme Court holding that Arizona statutes requiring voters to cast personal votes at polling places located in their county of residence, and prohibiting all but a narrow few third parties from collecting and returning absentee ballots, did not violate § 2 of the federal Voting Rights Act of 1965, as amended in 1982 to ensure that "the political processes leading to nomination or election in [a] State or political subdivision are . . . equally open to participation by members of . . . protected class[es]" and so those have equal "opportunity" with "other members of the electorate to participate in the political process and to elect representatives of their choice." *Brnovich*, __ U.S. at __, 141 S. Ct. at 2330-33, 2340-41, and 2350 (in re 52 U.S.C. § 10301(b))

86

(internal punctuation and emphasis omitted)). In context, the Supreme Court made the isolated statement, cited by the Majority to support an entirely different proposition here, *to refute* a *dissent-proposed* construction of the Voting Rights Act which would not only "transfer much of the authority to regulate election procedures from the States to the federal courts," but would also "have the potential to invalidate just about any voting rule a State adopts" including "even facially neutral voting rules with long pedigrees that reasonably pursue important state interests." *Brnovich*, __ U.S. at __, 141 S. Ct. at 2340-43 (noting that "[n]othing about [§ 2's requirements of] equal openness and equal opportunity dictates such a [dissent-proposed] high bar for States to pursue their legitimate interests"—nor was there anything "democratic about the dissent's attempt to bring about a wholesale transfer of the authority to set voting rules from the States to the federal courts").

¶144 Likewise the isolated statement seized on by the Majority in Opinion, ¶ 15, from Justice Scalia's *Crawford* concurrence with the Supreme Court's holding that an Indiana statute requiring in-person voters to show a government-issued photo ID was a reasonable, non-discriminatory time, place, and manner voting regulation under the *Burdick*/*Anderson* intermediate scrutiny standard. *Crawford*, 553 U.S. at 204-09, 128 S. Ct. at 1624-27 (Scalia, J., concurring). Though cited in support of an entirely different proposition here, Justice Scalia's statement was merely explanatory of the *Burdick*/*Anderson* intermediate scrutiny standard in the context of stating his preference to have "decide[d]" the issue "on the grounds that" the challenging parties' assertion (that the subject government photo ID requirement substantially interfered with the right to vote and was thus subject to strict scrutiny) was "irrelevant" because the resulting burden was "minimal and justified."

87

*Crawford*, 553 U.S. at 204-09, 128 S. Ct. at 1624-27 (Scalia, J., concurring). The Scalia concurrence thus merely points out, correctly, what the Majority so desperately strains to avoid recognizing here:

> [*s*]*trict scrutiny* is appropriate *only if* the *burden is severe*. . . Ordinary and widespread burdens, such as those requiring nominal effort of everyone, are not severe. Burdens are *severe* [*only*] *if* they *go beyond* the *merely inconvenient*.

*Crawford*, 553 U.S. at 204-05, 128 S. Ct. at 1624-25 (Scalia, J., concurring) (internal punctuation and citations omitted, emphasis added). The "virtually impossible" bogeyman, seized upon by the Majority out of context in Opinion, ¶¶ 15 and 31-32, to denigrate the *Burdick*/*Anderson* standard, was not a statement even made by Justice Scalia in his *Crawford* concurrence—it appears only in a secondary citation to *Williams v. Rhodes*, 393 U.S. 23, 24-25 and 32-34, 89 S. Ct. 5, 7-8 and 11-12 (1968) (holding that the subject state election laws were *subject to strict scrutiny* as "invidious discrimination" in violation of Fourteenth Amendment equal protection because they *severely burdened* "voting and associational rights" by "mak[ing] it virtually impossible for any [*new political*] *party* to qualify on the ballot"—emphasis added). *See Crawford*, 553 U.S. at 204-05, 128 S. Ct. at 1624-25 (Scalia, J., concurring) (citing *Storer v. Brown*, 415 U.S. 724, 728-29, 94 S. Ct. 1274, 1278, (1974) (discussing *Rhodes*)); *compare* Opinion, ¶¶ 15 and 31-32. Doubling down, the Majority punctuates its cascading analytical sleight of hand with the similarly false and misleading straw man that:

> [the Montana] Constitution affords no suggestion that a person should have to [sur]mount all but the "virtually impossible" hurdle simply to participate in the most elemental characteristic of citizenship. . . . Given the textual strength and history of Montana's explicit constitutional protection, and its

88

independent analysis from the equal protection clause, we should not put its independent force at risk of dilution by later federal precedents.

Opinion, ¶¶ 31-32. Neither its demonstrably false mischaracterization of isolated snippets from *Brnovich* and the Scalia *Crawford* concurrence, nor any other cited authority, supports the Majority's assertions here that the *Burdick/Anderson* intermediate scrutiny standard is now weaker or less "meaningful," now "provides less protection" of the right to vote than "four decades ago," or will somehow provide less protection of the right to vote than intended by the Framers of the Montana Constitution in 1972.[13]

¶145 The critical analytical issue here is not whether this Court is bound by the *Burdick/Anderson* intermediate scrutiny "balancing test" as a matter of federal constitutional law (we clearly are not), but rather, whether we should apply it as a *persuasive non-binding* interpretive framework for judicial review of the subject time, place, and manner voting regulations at issue here because the right to vote expressed in Mont. Const. art. II, § 13, is *substantively coextensive* with the fundamental right to vote protected under the United States Constitution, both at the time of framing in 1972 and now. Why the Court tries to avoid the logically inescapable answer to that question, by emphasizing the isolated out-of-context reference to "*federal* courts" in Opinion, ¶ 15, is thus baffling at first glance. The Majority knows full well that application of the so clearly applicable *Burdick/Anderson* intermediate scrutiny standard to time, place, and manner

---

[13] Like its *Dobbs-Roe* elasticity assertion, see Dissent n.11 *supra*, the Court's unsupported assertions denigrating the *Burdick/Anderson* standard are not demonstrable or otherwise supported legal points, but rather, more of a statement manifesting the Majority's disdain for that standard as an inconvenient obstacle to a desired end.

voting regulations that merely burden, but do not substantially interfere with, the right to vote would not in any way involve "federal courts," or allow federal courts to exercise review over any of the voting regulations at issue under the Montana Constitution here. Nor would it diminish the voting and election administration regulation exclusively granted to the Legislature by the Montana Constitution. The only apparent problem posed by application of the *Burdick*/*Anderson* intermediate scrutiny standard is that it would require the Majority to give due deference to the Legislature's asserted rationale for enacting the time, place, and manner voting regulations at issue in the exercise of its express constitutional authority and duty. In the wake of its false-pretenses dismissal of the *Burdick*/*Anderson* intermediate scrutiny standard, equally baffling is how or on what basis the Court can then *credibly* pluck a manifestly incompatible intermediate scrutiny standard, specifically developed for a narrow class of Montana equal protection claims[14] involving legislation that discriminates in the availability or exercise of a *non-fundamental* Montana constitutional *right*, for non-equal-protection application to non-discriminatory time, place, and manner regulations that may slightly burden but do no substantially interfere with the exercise of a *fundamental* Montana constitutional right.

¶146    After falsely declaring that the Montana Constitution provides greater protection of the right to vote than the United States Constitution, and that the voting regulation specific *Burdick*/*Anderson* intermediate scrutiny standard is now weaker and no longer

---

[14] *See* Mont. Const. art. II, § 4 ("[n]o person shall be denied the equal protection of the laws," nor shall "the state [or] any person, firm, corporation, or institution . . . discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas").

"meaningful," Opinion, ¶¶ 15 and 17, the Majority continues its cascading analytical sleight of hand by declaring that the standard of constitutional scrutiny for regulations that may burden without substantially interfering with the right to vote is the intermediate scrutiny standard previously applied in *Butte Community Union v. Lewis*, 219 Mont. 426, 712 P.2d 1309 (1986); *Billings Deaconess Med. Ctr. v. Mont. Dep't of Soc. & Rehab. Servs.*, 222 Mont. 127, 720 P.2d 1165 (1986); and *State ex rel. Bartmess v. School Bd.*, 223 Mont. 269, 726 P.2d 801 (1986). Opinion, ¶¶ 33, 36, 38-46, 111-12, and 116. The Court conveniently neglects to mention, however, that:

(1)     the *Butte Community* standard is an intermediate standard of constitutional scrutiny *uniquely* developed for *equal protection claims* under Mont. Const. art. II, § 4;

(2)     by its terms the *Butte Community* standard further uniquely applies only to a narrow class of equal protection claims involving legislation that discriminates in the availability or exercise of a Montana constitutional *right or benefit* that this Court has deemed *not fundamental* because not listed with the fundamental rights listed in Mont. Const. art. II; and

(3)     the cases cited in support of the Majority assertion that the *Butte Community* standard applies to voting regulations not subject to strict scrutiny were equal protection cases involving a non-fundamental right rather than non-discriminatory time, place, and manner regulations of the fundamental right to vote as at issue here.

*See* Opinion, ¶¶ 36, 38-46, 111-12, and 116; *compare Butte Community*, 219 Mont. at 429-31 and 433-34, 712 P.2d at 1311-14; *Billings Deaconess*, 222 Mont. at 131-32, 720 P.2d at 1168; and *Bartmess*, 223 Mont. at 274-75, 726 P.2d at 804-05. Unlike *Butte Community*, *Billings Deaconess*, and *Bartmess*, this case is neither an equal protection claim case, Opinion, ¶¶ 10, 20, 32, 60, 85, and 106, nor does it involve legislation that facially discriminates between distinct classes of people in the exercise or availability of

91

*non-fundamental* Montana constitutional rights or benefits. Thus, the *Butte Community* standard of intermediate scrutiny, narrowly applicable in certain types of Montana equal protection challenges involving Montana constitutional rights which are *not fundamental*, is as a matter of law, simply analytically incompatible by its terms for application to voting regulations that may burden, but do not substantially interfere with, the *fundamental* right to vote. *See Butte Community*, 219 Mont. at 429-31 and 433-34, 712 P.2d at 1311-14; *Billings Deaconess*, 222 Mont. at 131-32, 720 P.2d at 1168; *Bartmess*, 223 Mont. at 274-75, 726 P.2d at 804-05.

¶147 Desperate to denigrate the *Burdick/Anderson* standard in favor of a patently incompatible Montana-specific equal protection standard of intermediate scrutiny, the Majority dismisses the analytical model presented by *Crawford* on the pretense that it applied the *Burdick/Anderson* intermediate scrutiny standard in the context of a Fourteenth Amendment equal protection claim. *See* Opinion, ¶ 32. Close examination reveals, however, that the Majority's assertion is yet another analytical straw man concocted to avoid the undesirable outcome that would result from application of the *Burdick/Anderson* standard to the evidentiary record here. Putting aside for the moment the clearly erroneous findings of fact used to trigger strict constitutional scrutiny here, *see infra*, the Court disclaims equal protection as a constitutional basis for its decision here, Opinion, ¶¶ 20, 32, 60, 85, and 106, but then amorphously applies a Montana-specific equal protection standard of intermediate scrutiny to a "disparate impact" theory selectively snipped out of the equal protection context in which such claims are uniquely cognizable. *See* Opinion, ¶¶ 32 and 69 (referencing "disparate impact" and "disparate treatment"); *compare*

*Hernandez v. New York*, 500 U.S. 352, 362, 111 S. Ct. 1859, 1867-68 (1991) (disparate impact resulting from a "classification does not alone show its purpose" because "[e]qual protection analysis turns on the intended consequences of government classifications"— unless adopted "with the intent of causing the impact asserted" the "impact itself does not violate [equal protection]").[15]   The isolated language from the Scalia *Crawford* concurrence in Opinion, ¶ 32—that generally applicable and *facially non-discriminatory* legislative classifications do not violate equal protection absent a showing of intentional discriminatory impact—is a manifestly correct statement of well-settled, black-letter equal protection law.[16]  With the obvious reason for why the Majority sidesteps the challenging parties' equal protection claims thus exposed, a key component of its analytical sleight of hand in this case comes into clear focus, i.e., erroneous conflation of an equal protection

---

[15] *Accord, e.g.*, *Gazelka v. St. Peter's Hosp.*, 2018 MT 152, ¶¶ 15-24, 392 Mont. 1, 420 P.3d 528; *State v. Spina*, 1999 MT 113, ¶ 85, 294 Mont. 367, 982 P.2d 421 (quoting John E. Nowak, et al., *Constitutional Law* 600 (2d ed. 1983)).

[16] Additional context from the *Scalia* concurrence further illustrates the Majority's desperate need to avoid application of the *Crawford* analytical model, to wit:

> The Fourteenth Amendment does not regard neutral laws as invidious ones, *even when their burdens purportedly fall disproportionately on a protected class.  A fortiori* it does not do so when, as here, the classes complaining of disparate impact are not even [constitutionally] protected [suspect classes]. . . . The universally applicable requirements of Indiana's voter-identification law are eminently reasonable.  The burden of acquiring, possessing, and showing a [widely available government-issued] photo identification is simply not severe, because it does not even represent a significant increase over the usual burdens of voting[,] [a]nd the State's [asserted] interests are sufficient to sustain that minimal burden.   That should end the matter.  That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is [constitutionally] required.

*Crawford*, 553 U.S. at 207-09, 128 S. Ct. at 1626-27 (Scalia, J., concurring) (internal punctuation and citations omitted, emphasis added).  *Accord Crawford*, 553 U.S. at 202-04, 128 S. Ct. at 1623 (majority holding).

specific "disparate impact" theory, under a Montana-specific equal protection standard of intermediate scrutiny, *in the analytical context of* a purported *non*-equal-protection-based constitutional conformance review of facially neutral and non-discriminatory voting regulations.[17]

¶148   With the Opinion's cascading analytical sleight of hand uncovered, the resulting mischief becomes clear.   However well intentioned, the Court's faulty constitutional analysis provides analytical cover, under the guise of constitutional conformance review,

---

[17] Illustrating my point, in rejecting the *Burdick/Anderson* intermediate scrutiny standard, the Majority posits:

> [I]f the Legislature passes a measure that *impacts* the free exercise of the right of suffrage, it must be held to demonstrate that it did not choose the way of greater interference.   This standard should govern equally when a facially neutral restriction *disproportionately impacts identifiable groups* of voters.   *Accord Crawford*, 553 U.S. at 236, 128 S. Ct. at 1643 (Souter, J., dissenting) (expressing the view that the challenged statute "crosses a line when it *targets the poor and the weak*").

Opinion ¶ 33 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S. Ct. 995, 1003 (1972), internal punction and citation omitted, emphasis added).   *Dunn* was a Fourteenth Amendment equal protection claim case involving a state durational residence requirement that was subject to and failed strict scrutiny because it "*absolutely denied*," rather than merely burdened, the right to vote of a subclass of voters by forcing them to trade their right to vote for exercise of their fundamental right to travel.   *Dunn*, 405 U.S. at 336-38 and 343, 92 S. Ct. at 999-1003 (emphasis added).   Thus, in the same breath the Majority attempts to denigrate *Crawford* as a model application of the *Burdick/Anderson* standard because it was an application of the *Burdick/Anderson* standard in the equal protection context, *see* Opinion, ¶ 32, but then relies on a case involving an equal-protection-specific "disparate impact" theory regarding a challenged voting regulation that was clearly subject to strict scrutiny under the right to equal protection of law.   Opinion, ¶ 33.   The Court attempts to bolster its unmistakable equal protection disparate impact theory, in the context of its purported *non*-equal-protection analysis here, by citation to yet another equal protection principle.   Opinion, ¶ 33 (citing *Crawford*, 553 U.S. at 236, 128 S. Ct. at 1643 (Souter, J., dissenting)).   Aside from the analytical incongruity in its conflated non-equal-protection equal protection analysis, not a shred of record evidence supports the manifest innuendo in the Majority's supplemental citation parenthetical, i.e., that the Legislature intended any of the legislative regulations at issue here to intentionally "target[] the poor and the weak."

94

to second-guess the facially non-discriminatory public policy determinations of the Legislature under Mont. Const. art. IV, § 3.  The erroneous application of strict scrutiny, based on clearly erroneous findings of fact, to the prohibition of paid ballot collectors and 32-hour push-back of the voter registration deadline, as well as the erroneous application of an anomalous intermediate scrutiny formulation lacking any objective standard to the elimination of student IDs as a primary form of voter ID, clears the analytical way for the Majority to subjectively second-guess the Legislature, with *no deference* to legislative policy determinations, as to whether the methods chosen by the Legislature to carry out its express and exclusive duty under Mont. Const. art. IV, § 3 (duty to regulate voter "registration, absentee voting, and administration of elections," and to "insure the purity of elections and guard against abuses of the electoral process"), are the "least onerous" or most "reasonable" in the eyes of this Court.  *See* Opinion, ¶¶ 48, 58-59, 63, 79-80, 102, 112, 114, 117-19.[18]

---

[18] Even in the Montana equal protection context regarding *facially discriminatory* legislation involving *non-fundamental* Montana constitutional rights, the *Butte Community* standard of intermediate scrutiny is a highly subjective balancing standard lacking the objective standards embodied in the general standard of intermediate scrutiny applicable under the Equal Protection Clause of U.S. Const. amend. XIV. *See Butte Community*, 219 Mont. at 434, 712 P.2d at 1313-14 (requiring that subject legislative discrimination be "reasonable" and "more important than" the non-fundamental Montana constitutional right at issue); *compare Butte Community*, 219 Mont. at 431-33, 712 P.2d at 1312-13 (noting limited application of general standard of intermediate scrutiny—subject legislative discrimination must be "substantially related to an important government interest"—applicable to Fourteenth Amendment equal protection claims not subject to strict scrutiny and variants of that standard *applied to* "*limitations on the right to vote*"—internal punctuation and citations omitted, emphasis added); *Clark v. Jeter*, 486 U.S. 456, 461, 108 S. Ct. 1910, 1914 (1988) (to withstand equal protection intermediate scrutiny the subject legislative "classification must be substantially related to an important governmental objective"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441, 105 S. Ct. 3249, 3255 (1985) (discriminatory gender and parental illegitimacy classifications "fail[] unless . . . substantially related to" an "important governmental interest"—citing *Mississippi University for Women v. Hogan*, 458 U.S.

¶149 Both this Court and the United States Supreme Court similarly recognize three distinct standards of scrutiny for judicial review of challenged legislation for constitutional conformance—strict scrutiny, intermediate scrutiny, and rational basis scrutiny. *See, e.g.*, *State v. Ellis*, 2007 MT 210, ¶ 11, 339 Mont. 14, 167 P.3d 896; *Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, ¶¶ 17-20, 325 Mont. 148, 104 P.3d 445; *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641-62, 114 S. Ct. 2445, 2458-69 (1994) (discussing levels of applicable constitutional scrutiny in First Amendment and substantive due process contexts); *Clark v. Jeter*, 486 U.S. 456, 461, 108 S. Ct. 1910, 1914 (1988) (discussing levels of applicable constitutional scrutiny in the context of Fourteenth Amendment equal protection challenges). Whether as a matter of substantive due process or equal protection under U.S. Const. amend. XIV, or direct application on review of a legislative enactment affecting a fundamental Montana constitutional right, strict constitutional scrutiny applies only if the enactment substantially interferes "with the exercise of a fundamental right." *Wadsworth v. State*, 275 Mont. 287, 302, 911 P.2d 1165, 1174 (1996) (*inter alia* citing *Arneson v. Mont. Dep't of Admin.*, 262 Mont. 269, 272, 864 P.2d 1245, 1247 (1993)). Strict

---

718, 102 S. Ct. 3331 (1982), and *Craig v. Boren*, 429 U.S. 190, 97 S. Ct. 451 (1976)). *See also Cleburne*, 473 U.S. at 441-42, 105 S. Ct. at 3255 (declining to extend "heightened" intermediate scrutiny to age discrimination despite that "treatment of the aged in this Nation has not been wholly free of discrimination" because, unlike those that have faced racial and other suspect class discrimination, older people "have not" been subject to "a history of purposeful unequal treatment or . . . unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities"—"where individuals in [a] group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, . . . courts have been very reluctant, as they should be . . . with . . . respect for . . . separation of [constitutional] powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued," and thus "the Equal Protection Clause requires only a rational means to serve a legitimate end" "[i]n such cases"—citing *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S. Ct. 2562, 2567 (1976)).

scrutiny is thus triggered only if the challenging party satisfies the initial burden of affirmatively demonstrating that the enactment at issue substantially *interferes with* the exercise of a fundamental constitutional right. *See Cooper v. Harris*, 581 U.S. 285, 291-93, 137 S. Ct. 1455, 1463-64 (2017); *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 193, 137 S. Ct. 788, 800-01 (2017); *Jana-Rock Const., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006). *See also McDermott v. Mont. Dep't of Corr.*, 2001 MT 134, ¶ 34, 305 Mont. 462, 29 P.3d 992. Only then does the burden shift to the state or other defending party to demonstrate that the challenged enactment survives strict scrutiny. *See Cooper*, 581 U.S. at 292, 137 S. Ct. at 1464; *Bethune-Hill*, 580 U.S. at 193, 137 S. Ct. at 801; *Jana-Rock Const.*, 438 F.3d at 205. *Accord McDermott*, ¶¶ 31-32. The question of whether a challenged statute substantially interferes with that right is ultimately a question of law for judicial determination. *Wadsworth*, 275 Mont. at 295-98, 911 P.2d at 1170-71.

¶150 Here, based on various District Court findings of fact, the Majority holds that the Legislature's push-back of the voter registration deadline from election day to noon the day before (§ 13-2-304, MCA (2021)) substantially interferes with the exercise of the right to vote in Montana because it disparately *burdens* the exercise of the right to vote by "*many of*" the "70,000 Montanans" that have used same-day registration "*since 2005*, and that many" voters, particularly including working voters, "first-time voters[,] and Native Americans," would "be disenfranchised without the availability of election day registration." Opinion, ¶¶ 70-74 and 84. The Court concludes that substantial evidence manifests that "[m]any Native American voters . . . rely on election day registration because

97

of numerous . . . issues," including "lack of access to mail" service, transportation, and the long distances to county seats where they can register," "[m]any of . . . [which] cannot be overcome, or become too costly to overcome, and thus disenfranchise [those] voters." Opinion, ¶ 73.

¶151 The Court holds that the Legislature's prohibition of paid third-party ballot collectors (2021 Mont. Laws ch. 534, § 2) thus substantially interferes with the exercise of the right to vote in Montana because it disparately *burdens* "Native Americans [who] disproportionately rely on [third-party] ballot collect[ors] to vote, in part due to a history of discrimination around voting" and "unique circumstances in Indian Country that make it much more difficult to access polling places or post offices" due to the "remote areas" in which "[m]any" live, that "[m]any" do not have "mail service to their homes," and "numerous [other] factors" not challenged by the State on appeal. Opinion, ¶ 97. The Majority concludes that substantial evidence supports the ultimate District Court finding that the prohibition of paid third-party ballot collectors will "take[] away the only option to vote for a significant number of Native Americans living on reservations," and thus substantially "interferes with the right to vote" in Montana. Opinion, ¶ 99.

¶152 Upon close examination, however, those ultimate findings are primarily based on no more than 2016 and 2018 voter turnout data, social and economic data and witness testimony regarding general economic and living conditions on Montanan Reservations, and "voting cost" modeling *projections* of litigation-retained political scientists. The speculative "voting cost" projections are then the primary basis for the corresponding District Court finding that prohibition of paid ballot collectors will in fact *unduly and*

98

*disparately burden* a wide swath of Montana's electorate by requiring them to either *timely mail their absentee ballots*, *arrange for a trusted unpaid family member or friend* to timely return their absentee ballots, or *personally deliver their own ballots to a polling place*. However, despite cursory assertion of a causal link, the modeling projections, underlying data, and various other anecdotal witness observations, opinions, and characterizations in the end *proves no more than a correlation*, *based on* various *general assumptions and statistical data*, between the prohibition *and speculative projection regarding anticipated voter turn-out*. Without more, evidence of a mere correlation between an asserted cause and an asserted effect is not evidence of a direct causal link for purposes of assessing the constitutionality of a statute. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 800, 131 S. Ct. 2729, 2739 (2011) (rejecting California assertion that psychological studies correlating exposure to violent video games to asserted harmful effects on children was competent evidence of a causal link sufficient to manifest a compelling state interest for purposes of strict scrutiny).

¶153 As a threshold matter, moreover, it is beyond dispute that the as-yet implemented prohibition of paid ballot collectors did not, nor will not, cause the noted "obstacles" faced by Native American voters on Montana Reservations. Nor is the fact that overall Reservation voter turnout has significantly increased due to the extensive registration, canvassing, and voter assistance efforts of political organizations involved in paid third-party ballot collection efforts evidence that the prohibition of paid ballot collectors will prevent proportionally significant numbers of Montanans from exercising their right

to vote.[19]  For example, as to Reservation Native Americans, the Plaintiffs' central factual assertion is that barring paid ballot collectors will likely make it more difficult for Reservation Native Americans who want to vote absentee, which will in turn be the likely cause of some unknown quantum of them *to decide* not to vote at all.  At bottom, there is simply no particularized evidence that prohibition of paid ballot collectors will likely cause any significant decrease in absentee voting *for any quantifiable segment* of the Native American population on Montana Reservations.

¶154 Plaintiffs' generalized voting-cost theory, and accompanying anecdotal observations and concerns, proves no more than a highly speculative *possibility* that some *unquantifiable segment* of prior absentee voters, who previously benefitted from paid ballot collection services, *might choose* not to vote rather than timely mail their absentee ballot or use a qualified unpaid family or friend collector like other Montana absentee voters, or even travel to the polls on election day.  Regardless of any disproportionate nature of the independently-caused circumstances that may hamper voter turnout in Montana, the evidentiary record in this case is devoid of any substantial non-speculative evidence that prohibition of paid ballot collectors will likely be a cause of any significant decrease in voter turnout, even in any narrow subclass of Montana voters identified by the Plaintiffs.  The District Court's ultimate finding of fact that prohibition of paid ballot collectors will

---

[19] Of course, prohibition of *paid* ballot collectors will not prohibit any of the Plaintiffs or other political organizations in Montana from continuing to engage in the extensive voter registration assistance, repetitive canvassing, and other voter assistance efforts that have undoubtedly resulted in significantly higher voter turnout in Montana.

substantially interfere with, rather than cause some disparate burden on, a relatively small percentage of those who vote in Montana is clearly erroneous.

¶155 Further troubling, the Majority's undiscerning gloss-over of the manifest deficiency of pertinent evidence in this case makes much ado about the fact that the State failed to present any contrary evidence, and does not dispute on appeal the factual evidence presented by the Plaintiffs below. However, the lack of evidence rebutting the Plaintiffs' evidence does not change or remedy the manifest deficiency of the evidence presented as support for the ultimate District Court finding that the prohibition of paid absentee ballot collectors will *substantially interfere* with voting, rather than merely make it *less convenient* for a disproportionately select few to vote absentee.

¶156 As to the Legislature's push-back of the voter registration deadline from election day to noon the day before, the District Court's ultimate finding of fact that it will substantially interfere with the right to vote by "disenfranchis[ing]" voters, particularly Reservation Native Americans, working voters, and first-time voters, is *exclusively based* on no more than that: (1) election day registration "has become wildly popular" based on the fact that "over 70,000 Montanans" have "utilize[d] it since 2006" following enactment in 2005; (2) a majority of Montanans who voted "rejected eliminat[ion of] election day registration by a 14-point margin" in 2014; (3) "election day registration typically increases voter turnout by 2-7% compared to not having it" due to "some people's habit" and that "many people cannot take work off to register and then again to vote"; (4) "election offices are open late on election day"; (5) some "people who thought they were registered do not recognize there is a problem until they show up to vote on election day"; and (6) "election

day is by far the most energizing day that gets people excited to register and vote" Opinion, ¶¶ 6 and 71. The Majority goes so far to add its own policy justification in support of election day registration, to wit:

> Election day registration is a failsafe that allows eligible voters to vote on election day if they would otherwise [be unable] due to registration issues . . . [which] may occur on election day due to our sometimes confusing labyrinth of elections laws. For example, voters who have moved from one county to another since the last election and *who have not updated their voter registration* would be prevented from voting without election day registration unless they could make it back to their old county before polls closed.

Opinion, ¶ 64 n.11 (emphasis added). The Court, of course, identifies not a single election law it views as confusing.

¶157  While most of the above-noted facts and justifications found by the District Court and the Majority here are no doubt true, they are at most *good public policy justifications* for election day registration as a means *to make it more convenient for more people to vote*. However, they *simply do not prove* that the *absence of such conveniences*, granted in the discretion of the Legislature in the first place only 19 years ago, will necessarily "disenfranchise" voters or prevent people from voting in this state and country as they have for over 100 hundred years before enactment of election day voter registration in 2005. Nor have Plaintiffs, the District Court, or the Majority cited any legal authority, or articulated any other credible support, for the *legal proposition* that the fundamental right to vote necessarily includes the *most convenient or most preferable way to vote*, particularly in light of the fact that a clear majority of the Framers refused to enshrine election day registration into our new Constitution, even in the face of a then-prevailing

102

40-day voter registration deadline.[20]  Nor are the isolated comments of a few individual Constitutional Convention Delegates, cherry-picked out of context by the Majority, sufficient to support such a novel legal proposition for the first time here.

¶158   Manifesting its significantly flawed constitutional analysis, the Court retorts that:

> argu[ing] that because the registration deadline used to be 40 days before the election, it does not interfere with the right to vote to push it back here . . . [is] like arguing that because absentee voting was once not allowed, it would not interfere with the . . . right to vote to eliminate it today—even though three-quarters of [Montana] voters . . . now utilize it.

Opinion, ¶ 74.  The Court's retort would be an interesting legal point, if it was actually a supported legal proposition.  It is not.  The Court's retort is classic apples-to-oranges misdirection.   The constitutionality of the Legislature's 32-hour push-back of the registration deadline neither has anything to do with the modern preference of Montanans for *absentee voting*, nor is there any evidence, even if of constitutional import *arguendo*, of such a proportionally significant preference of an overwhelming super-majority of Montana voters for election day registration, even now.   The sum total of the "undeniabl[e]" evidence upon which the Court relies to strike-down a mere 32-hour push-back of the voter registration deadline, Opinion, ¶ 74, is no more than, since 2005, "election day registration was an improvement in Montana's election processes."  Opinion, ¶ 79.  So says the Court from on high.  The Majority inconsistently disclaims, moreover, that:

---

[20] While voting is a fundamental constitutional right, "[i]t does not follow, however, that the right to vote in any manner and [the related] right to associate for political purposes through the ballot are absolute." *Burdick*, 504 U.S. at 433, 112 S. Ct. at 2063 (citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 193, 107 S. Ct. 533, 536 (1986)).

our holding does not mean that once the Legislature has . . . [liberalized the voter registration deadline] it may never backtrack *if the expansion was unwise*. Rather, the [Legislature] must show—depending on if plaintiffs first show the [later push-back of the deadline] minimally burdens the right to vote or interferes with it—that the [later push-back of the deadline] meets the correct level of scrutiny.

Opinion, ¶ 74. Not true. The flawed constitutional reasoning applied here by the Court manifests *exactly that*. Despite its attempt to couch its disclaimer in terms of constitutional scrutiny, the Court exposes its view that once the Legislature grants a statutory right or benefit as a matter of legislative discretion, it may later retract it only if the grant was "unwise." The Court's flawed analysis clearly manifests that it is and will be for this Court in its infinite wisdom—not the Legislature in accordance with its express constitutional authority—to decide whether any later legislative push-back of the voter registration deadline is wise or "unwise," just as here, without any deference to the Legislature. *See*, *e.g.*, Opinion, ¶ 59 ("[w]e need not balance the State's [asserted] interests against the burden imposed because the State has not demonstrated that its interests are reasonable").

The Court's attempted disclaimer follows its earlier assertion that its holding today "does not mean that election day registration is forevermore baked into our Constitution." Opinion, ¶ 68. Maybe not, but the Court has now certainly "baked" election day registration into our Constitution for now, a feat which an overwhelming 76-22 majority of *the actual Framers* of our Constitution *squarely refused to do*.

¶159 District court findings of fact are clearly erroneous if not supported by substantial evidence or, upon our independent review of the record, we are definitely and firmly convinced that the "court misapprehended the effect of the evidence" or was otherwise

mistaken. *Larson*, ¶ 16. Consequently, even when otherwise supported by substantial record evidence, lower court findings of fact are still clearly erroneous if the record clearly manifests that the "court misapprehended the effect of the evidence" for the purpose offered. *Larson*, ¶ 16. For the foregoing reasons, the District Court's ultimate findings of fact that the Legislature's push-back of the statutory voter registration deadline from election day to noon the day before, and prohibition of paid ballot collectors, will *substantially interfere* with the exercise of the right to vote by Reservation Native Americans, working voters, and first-time voters were clearly erroneous because the District Court clearly misapprehended the effect of the evidence as proof for those points.

¶160 Based on the Plaintiffs' evidentiary showing, and the fact that the State failed to present any contrary evidence of any history of absentee ballot collection fraud, the District Court made the additional sweeping finding and conclusion that the Legislature's prohibition of paid ballot collectors serves no legitimate purpose because it neither enhances the security or integrity of absentee voting, nor substantially reduces or contains the costs or burdens of conducting elections. Under strict scrutiny, the District Court and the Majority thus further conclude that the State failed to present evidentiary proof of any compelling state interest warranting the disparate burdens that Reservation Native Americans, working voters, and first-time voters will allegedly face upon prohibition of paid ballot collectors and push-back of the voter registration deadline from election day to noon the day before.

¶161 However, even if triggered upon satisfaction of the challenging party's initial burden, a burden clearly not satisfied here, strict scrutiny does not necessarily require the

105

State to make an *evidentiary showing* of a compelling state interest or that the subject statute is narrowly tailored to further that interest. *Mont. Auto. Ass'n v. Greely*, 193 Mont. 378, 383-84, 632 P.2d 300, 303-04 (1981). As a threshold matter, the questions of whether an asserted government interest is constitutionally compelling and whether a challenged statute is narrowly tailored to further that interest are questions of law. *W. Tradition P'ship, Inc. v. State*, 2011 MT 328, ¶ 35, 363 Mont. 220, 271 P.3d 1 (citing *State v. Pastos*, 269 Mont. 43, 47, 887 P.2d 199, 202 (1994)), *cert. granted, judgment rev'd sub nom. on other grounds by Am. Tradition P'ship, Inc. v. Bullock*, 567 U.S. 516, 132 S. Ct. 2490 (2012); *Wadsworth*, 275 Mont. at 295-98, 911 P.2d at 1170-71; *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 93 (1st Cir. 2013); *Garner v. Kennedy*, 713 F.3d 237, 242 (5th Cir. 2013); *Lomack v. City of Newark*, 463 F.3d 303, 307 (3d Cir. 2006); *United States v. Hardman*, 297 F.3d 1116, 1127 (10th Cir. 2002).[21] A compelling government interest may be manifestly implied, moreover, from the language and effect of an enactment; judicial notice of precedent from other jurisdictions recognizing a compelling government interest in similar legislation; or judicial notice of a related manifest government interest in preventing corruption of the political process, preserving the integrity of essential government processes, or furthering the protection or exercise of

---

[21] Whether a statute satisfies strict scrutiny remains a question of law even if dependent on mixed questions of fact and law in a particular case. *See Barrus v. Mont. First Jud. Dist. Ct.*, 2020 MT 14, ¶ 15, 398 Mont. 353, 456 P.3d 577 (mixed questions of fact and law are questions of law reviewed de novo for correctness); *BNSF Ry. Co. v. Cringle*, 2012 MT 143, ¶ 16, 365 Mont. 304, 281 P.3d 203 (de novo review of mixed questions of fact and law); *Farmers Union Cent. Exch., Inc. v. Mont. Dep't of Rev.*, 272 Mont. 471, 474, 901 P.2d 561, 563 (1995) (clearly erroneous standard applies only to "'pure' findings of fact"); *Maguire v. State*, 254 Mont. 178, 181-82, 835 P.2d 755, 757-58 (1992) (conclusions of law, questions of law, and legal components of ultimate facts or mixed questions of law and fact reviewed de novo for correctness).

individual rights. *Greely*, 193 Mont. at 383-84, 632 P.2d at 303-04; *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52, 106 S. Ct. 925, 931 (1986); *State v. Hardesty*, 214 P.3d 1004, 1007-10 (Ariz. 2009) (federal citations omitted); *State v. Balzer*, 954 P.2d 931, 938 (Wash. Ct. App. 1998); *State v. Patzer*, 382 N.W.2d 631, 638 n.4 (N.D. 1986) (citing *Greely* and 1 Weinstein's Evidence ¶ 200 [04] at pp. 200-20 through 200-21 (1985) (quoting Karst, *Legislative Facts in Constitutional Litigation*, 1960 Sup. Ct. Rev. 75, 84)). *See also W. Tradition P'ship*, ¶¶ 16-36 (judicial notice of published sources of Montana history); *Wisconsin v. Yoder*, 406 U.S. 205, 213-14, 92 S. Ct. 1526, 1532 (1972) (judicial notice of compelling state interest in imposing reasonable regulations for control and duration of public education); *United States v. Israel*, 317 F.3d 768, 771-72 (7th Cir. 2003). Nor does satisfaction of strict scrutiny necessarily require *evidentiary proof* that the disputed means chosen by the legislature to further an asserted government interest was in fact "actually necessary" to achieve that interest, *Bethune-Hill*, 580 U.S. at 194, 137 S. Ct. at 801 (citation and punctuation omitted), or that *no other* feasible and less restrictive means was available to further the asserted government interest. *N.Y. State Univ. Bd. of Trs. v. Fox*, 492 U.S. 469, 476-78, 109 S. Ct. 3028, 3032-33 (1989).[22]

¶162   Though cursorily marginalized by the Court here in Opinion, ¶¶ 28 and 40 ("we must decide whether the responsibility regarding elections given to the Legislature" by Mont. Const. art. IV "is important enough" to require a "deferential balancing" approach under *Burdick*/*Anderson* intermediate scrutiny, but, "[g]iven the importance of the right to

---

[22] *Accord State v. Demontiney*, 2014 MT 66, ¶¶ 16-22, 374 Mont. 211, 324 P.3d 344.

vote in our Constitution, we think it improper for us to imagine possible reasons the Legislature has enacted a law that burdens the right to vote"), we have squarely similarly recognized, without requirement for evidentiary support, that "Montana has a compelling interest in imposing reasonable procedural requirements tailored to ensure the integrity, reliability, and fairness of its election processes." *Larson*, ¶ 40. "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick*, 504 U.S. at 432-35, 112 S. Ct. at 2062-64 (citation and internal punctuation omitted). Eliminating any doubt about the compelling nature of its stated justifications for the three enactments at issue here, the Legislature has an express, clear, and unequivocal constitutional duty to:

> provide by law the requirements for residence, registration, absentee voting, and administration of elections . . . and *shall* insure the purity of elections and guard against abuses of the electoral process.

Mont. Const. art. IV, § 3 (emphasis added). Thus, in Mont. Const. art. IV, § 3, *the Framers provided* the compelling interest required to justify the legislative enactments at issue in this case without requirement for evidentiary proof. Contrary to the Court's incredible assertion in Opinion, ¶ 40 ("the burden is on the State to show that the law is reasonable rather than us" trying to "conceive of any possible purpose" justifying the challenged legislation—internal punctuation omitted), there is no need for the Court "to imagine possible reasons" why the Legislature acted to push back the voter registration deadline from election day to noon the day before, prohibit paid ballot collectors, or eliminate

university student IDs as permissible primary voter identification because those reasons have already been clearly and unequivocally provided *by the Framers* in the express language of Mont. Const. art. IV, § 3, and even our own language in *Larson*, ¶ 40.  Thus, it is far from "improper" as asserted in Opinion, ¶ 40, for us to recognize and give due constitutional deference to those compelling government interests, whether under strict scrutiny or the proper standard of intermediate scrutiny.  The heretofore novel idea that has now been sold to this Court that legislative acts, and thus the alleged ulterior motives of the Legislature, can now be *put on trial* requiring evidentiary proof upon every constitutional challenge is, frankly, ludicrous and a serious affront to the delicate balance of constitutional separation of powers upon which our precious form of distributed-powers government so critically depends.[23]

---

[23] *See, e.g.*, *Bush v. Vera*, 517 U.S. 952, 977, 116 S. Ct. 1941, 1960 (1996) (racial discrimination requires justifying evidentiary basis under strict scrutiny); *Burson v. Freeman*, 504 U.S. 191, 206-11, 112 S. Ct. 1846, 1855-58 (1992) (time, place, and manner speech restrictions subject to strict scrutiny justified based solely on pertinent historical experience, consensus, and "simple common sense"); *Silvester v. Becerra*, 583 U.S. 1139, 1145-46, 138 S. Ct. 945, 949 (2018) (under intermediate scrutiny state must show "more than speculation or conjecture" such as relevant supporting "evidence or anecdotes" to "substantiate its concern"—internal punctuation omitted); *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628-29, 115 S. Ct. 2371, 2378 (1995) (time, place, and manner speech/association restrictions subject to intermediate scrutiny do not necessarily require supporting "empirical data" and may be justified based on "reference to studies," pertinent "anecdot[al]" information, or notice of historical experience); *Heller v. Doe*, 509 U.S. 312, 320-21, 113 S. Ct. 2637, 2643 (1993) (state "has no obligation" under rational basis scrutiny "to produce evidence to sustain" legislation because "legislative choice[s] [are] not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data"—the "burden is on the [challenging party] to negat[e] every conceivable basis which might support it" and legislation does not "fail rational-basis review because . . . not made with mathematical nicety or . . . [without] some inequality" because the "problems of government are practical ones and . . . [often involve] rough accommodations," as "illogical" or "unscientific" as they may be—internal punctuation and citations omitted).  Here, the "first step" of the Montana standard of intermediate scrutiny applied by the Majority "is similar to rational basis review," except for requiring the reviewing court to "conceive of" any possible justification.  Opinion, ¶ 40.

¶163 The rationale put forth by the Plaintiffs, District Court, and now the Majority here is strikingly similar to the rationale we rejected in *Greely* when a district court similarly concluded that a voter-approved ballot initiative did not pass strict scrutiny because it included no declaration of a compelling state interest and the State "offered no proof to establish such a need" in its defense. *Greely*, 193 Mont. at 383, 632 P.2d at 303 (citation omitted). Upon recognition that the "mere recitation of a compelling state interest" in the enactment would not necessarily have been conclusive in any event, we acknowledged that the State presented no "evidence to establish a compelling state interest," but nonetheless cited the district court to various authorities from other jurisdictions recognizing a compelling government interest in similar legislation. *Greely*, 193 Mont. at 383, 632 P.2d at 303. We explained that:

> Laws regulating or monitoring the raising and spending of money in the political arena have been enacted throughout the country as well as by the Congress. When these laws have been challenged, the courts have not had difficulty finding a compelling interest as a basis for enactment. *United States v. Harris*, 347 U.S. 612, 625, 74 S. Ct. 808, 816, (1954) (maintaining the integrity of a basic governmental process); *Young Americans for Freedom, Inc. v. Gorton*, 522 P.2d 189, 192 (Wash. 1974) (informing public officials and the electorate of the sponsors of efforts to influence governmental decision-making); *Plante v. Gonzalez*, 575 F.2d 1119, 1135 (5th Cir. 1978) (protecting citizens from abuse of the trust placed in the hands of elected officials); *Montgomery Cty. v. Walsh*, 336 A.2d 97, 106 (Md. Ct. App. 1975) (fostering a climate of honesty perceptible by the public at large).

*Greely*, 193 Mont. at 383-84, 632 P.2d at 303 (citations altered). We noted further that:

> Political corruption is a matter of common popular perception, which may or may not reflect the actualities of political life. *Judicial notice may be taken of the compelling need for disclosure laws which have as their purpose the deterrence of actual corruption and the avoidance of appearances of corruption. Buckley v. Valeo*, 424 U.S. 1, 67, 96 S. Ct. 612, 657 (1976).

110

*Greely*, 193 Mont. at 384, 632 P.2d at 303 (emphasis added, citation altered). We thus

held that:

> The absence of fact-finding capabilities in the initiative process is not proof
> of the absence of a compelling state interest in the enactment of I-85. To so
> hold would result in the emasculation of the initiative process in Montana
> with a result that no initiative could withstand a First Amendment challenge.

*Greely*, 193 Mont. at 384, 632 P.2d at 303. Likewise the unprecedented requirement

recognized by the Majority today that the Legislature must in every case put on *factual*

*proof* justifying the exercise of its constitutional authority upon challenge.[24] The rationale

put forth by the Plaintiffs, District Court, and now the Majority here is also strikingly

similar to the arguments rejected by the Supreme Court in applying *Burdick/Anderson*

intermediate scrutiny, not strict scrutiny, in rejecting a similar political party assertion that

an Indiana statute requiring voters to present a government-issued photo ID at the polls

"substantially burdens the right to vote" because it was: (1) "[un]necessary" to "avoid[]

election fraud"; (2) would "arbitrarily disenfranchise qualified voters who do not" have the

required photo ID; and (3) would "place an unjustified burden on those who cannot readily

---

[24] When strict or intermediate scrutiny *properly* applies upon actual satisfaction of the challenging party's initial triggering burden, the Legislature of course must satisfy its responsive burden of demonstrating the requisite relationship of the challenged legislation to a compelling or important government interest, as applicable under the applicable level of scrutiny. Of course that responsive burden requires more than mere reference to a pertinent compelling or important government interest. However, despite the Majority's attempt to marginalize the clearly pertinent principle recognized in *Greely*, not to mention as at issue here the specifically applicable and indisputable compelling state interest and power expressly stated and exclusively granted to the Legislature in Mont. Const. art. IV, § 3, the mere fact that the Legislature, or defending state entity, fails to rebut a purported contrary evidentiary showing made by a challenging party does not as a matter of law or fact, as the Majority's analysis implies, necessarily support a judicial finding or conclusion that the Legislature or defending state entity has failed to meet its responsive burden under the applicable level of constitutional scrutiny.

obtain such identification." *See Crawford*, 553 U.S. at 185-87 and 189-204, 128 S. Ct. at 1613-24. Whether under the United States Constitution or the Montana Constitution, the unassailable fact remains that:

> Election laws will *invariably impose some burden upon individual voters*. Each provision of a code, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—*at least to some degree*—the individual's right to vote and his right to associate with others for political ends.
>
> Consequently, *to subject every voting regulation to strict scrutiny* and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, *would tie the hands of States seeking to assure that elections are operated equitably and efficiently*. Accordingly, the *mere fact* that a State's [election law] creates barriers tending to [regulate elections and the process of voting for those purposes] *does not of itself compel* [*strict*] *scrutiny*.

*Burdick*, 504 U.S. at 433, 112 S. Ct. at 2063 (internal punctuation and citations omitted, emphasis added).[25] Accordingly, to evaluate a state legislative enaction that merely *burdens* the exercise of the right to vote, rather than *substantially interferes* with it, "a more flexible standard" of constitutional review is necessary. *Burdick*, 504 U.S. at 434, 112 S. Ct. at 2063. Therefore, upon challenge of a state election law, the reviewing court:

> must weigh the *character and magnitude of* the [*alleged burden* upon the right to vote] . . . *against the precise interests put forward by the State* as justifications for the burden imposed by its rule, . . . *consider*[*ing*] the *extent to which* those interests make it *necessary to burden* the plaintiff's rights.

---

[25] *See also Yick Wo*, 118 U.S. at 370-71, 6 S. Ct. at 1071 ("where the constitution has conferred a political right or privilege and . . . has not particularly designated the manner in which that right is to be exercised, it is clearly within the just and constitutional limits of the legislative power to adopt any reasonable and uniform regulations in regard to the time and mode of exercising that right which are designed to secure and facilitate the exercise of such right in a prompt, orderly, and convenient manner" without "subvert[ing] or injuriously restrain[ing] the right itself"— internal punctuation and citation omitted).

112

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens [the right to vote]. Thus, . . . when those rights are subjected to *severe restrictions*, the regulation [is subject to *strict scrutiny* and] must be narrowly drawn to advance a state interest of compelling importance.
>
> But when a state [voting or] election law [regulation] imposes only *reasonable, nondiscriminatory* [*burdens*] upon the [fundamental right to vote], the *State's important regulatory interests* are *generally sufficient* to justify the restrictions.

*Burdick*, 504 U.S. at 434, 112 S. Ct. at 2063 (internal punctuation and citations omitted, emphasis added). Thus, *Burdick*/*Anderson* intermediate scrutiny

> calls for . . . *deferen*[*ce*] [*to*] important regulatory interests . . . for *nonsevere, nondiscriminatory* restrictions, reserving *strict scrutiny* [*only*] *for* laws that *severely restrict* the right to vote. . . . Strict scrutiny is appropriate *only if* the *burden is severe.* . . . [T]he *first step* is to decide whether a challenged law *severely burdens the right to vote.* Ordinary and widespread burdens, such as those requiring nominal effort of everyone, are not severe. Burdens are *severe* [*only*] if they *go beyond* the *merely inconvenient.*

*Crawford*, 553 U.S. at 204-05, 128 S. Ct. at 1624-25 (Scalia, J., concurring) (internal punctuation and citations omitted).

¶164 In *Crawford*, the Supreme Court further explained that *Burdick*/*Anderson* intermediate scrutiny requires that,

> after identifying the burden . . . imposed[,] . . . we call[] for the demonstration of a corresponding [government] interest sufficiently weighty to justify . . . reasonable, nondiscriminatory restrictions [of the right to vote or ballot access]. . . . [A] court evaluating a constitutional challenge to an election regulation [must then] weigh the asserted [burden upon] the right to vote against the precise interests put forward by the State as justifications for the burden imposed by [the restrictions]. . . . [There is no] litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters. However slight that burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.

113

*Crawford*, 553 U.S. at 190-91, 128 S. Ct. at 1616 (internal punctuation and citations omitted). As here, "[w]hile petitioners argue[d] that the statute was actually motivated by partisan concerns and dispute[d] both the significance of the State's interests and the magnitude of any real threat to those interests," the State asserted several state interests justifying the burdens imposed on voters and potential voters which were "unquestionably relevant to the State's interest in protecting the integrity and reliability of the electoral process" including, *inter alia*,

> [the state] interest in deterring and detecting voter fraud. The State [also] has a valid interest in participating in a nationwide effort to improve and modernize election procedures that have been criticized as antiquated and inefficient. . . . Finally, the State relies[,] [*inter alia*,] on its interest in safeguarding voter confidence.

*Crawford*, 553 U.S. at 191-92, 128 S. Ct. at 1616-17 (*inter alia* citing the "National Commission on Federal Election Reform, To Assure Pride and Confidence in the Electoral Process 18 (2002) (with honorary cochairs former Presidents Gerald Ford and Jimmy Carter)," and the National Voter Registration Act of 1993, 107 Stat. 77, 42 U.S.C. § 1973, in which "Congress established procedures that would both increase the number of registered voters and protect the integrity of the electoral process" including "requir[ing] state motor vehicle driver's license applications to serve as voter registration applications"). The Court further noted that:

> [though] [t]he record contains no evidence of any [voter impersonation] fraud actually occurring in Indiana at any time in its history[,] [and] petitioners argue that provisions of the Indiana Criminal Code punishing such conduct as a felony provide adequate protection against the risk that such conduct will occur in the future[,] [i]t remains true, however, that flagrant examples of such fraud in other parts of the country have been

114

documented throughout this Nation's history by respected historians and journalists, [and] that occasional examples have surfaced in recent years, . . . demonstrat[ing] that not only is the risk of voter fraud real but that it could affect the outcome of a close election.

*Crawford*, 553 U.S. at 194-96, 128 S. Ct. at 1619.

Both evidence in the record and facts of which we may take judicial notice, however, indicate that a *somewhat heavier burden may* be placed on *a limited number of persons*[,] . . . includ[ing] elderly persons born out of State[] who may have difficulty obtaining a birth certificate; persons who because of economic or other personal limitations may find it difficult either to secure a copy of their birth certificate or to assemble the other required documentation to obtain a state-issued identification; homeless persons; and persons with a religious objection to being photographed. If we assume, as the evidence suggests, that some members of these classes were registered voters when [the subject statute] was enacted, the new identification requirement *may have imposed a special burden on their right to vote. . . .* [But] *even assuming* that the burden *may not be justified as to a few voters*, that conclusion is *by no means sufficient to establish* [the facial unconstitutionality of the statute].

*Crawford*, 553 U.S. at 199-200, 128 S. Ct. at 1621 (emphasis added).

¶165   As here, the Supreme Court noted that:

*Petitioners ask* this Court, in effect, to . . . *look*[] *specifically at a small number of voters who may experience a special burden under the statute* and weigh[] their burdens against the State's broad interests in protecting election integrity. . . . [They] urge us to ask whether the State's interests justify the burden imposed on voters who cannot afford or obtain a birth certificate and who must make a second trip to the circuit court clerk's office after voting. But *on the basis of the evidence* in the record it is *not possible to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified.*

First, the evidence in the record does not provide us with the number of registered voters [that would be affected]. . . . Further, the . . . evidence presented . . . *does not provide any concrete evidence of the burden* [that would be] imposed on [the affected] voters. . . . From th[e] limited evidence we do not know the magnitude of the impact [the enactment] will [actually] have. . . . The record does contain the [testimony] of one homeless woman who has a copy of her birth certificate, but was denied a photo identification card because she did not have an address. But [such testimony] gives no

115

indication of how common the problem is.

*In sum*, on the basis of the record that has been made . . . , *we cannot conclude* that the statute imposes *excessively burdensome requirements on any class of voters*. A facial challenge must fail where the statute has a plainly legitimate sweep. *When we consider* only the *statute's broad application to all Indiana voters* we conclude that it *imposes only a limited burden on voters' rights*. The precise *interests advanced by the State* are *therefore sufficient* to defeat petitioners' *facial challenge* to [the enactment].

Finally we note that petitioners have not demonstrated that the proper remedy—*even assuming an unjustified burden on some voters*—would be to invalidate the entire statute. When evaluating a *neutral, nondiscriminatory regulation of voting procedure*, we must keep in mind that *a ruling of unconstitutionality frustrates the intent of the elected representatives of the people*.

*Crawford*, 553 U.S. at 200-03, 128 S. Ct. at 1622-23 (internal punctuation and citations

omitted, emphasis added). The Court thus ultimately noted and held:

[P]etitioners stress . . . that all of the Republicans in the [legislature] voted in favor of [the government issued photo ID requirement] and the Democrats were unanimous in opposing it. . . . [The trial court] noted that the litigation was the result of a partisan dispute that had "spilled out of the state house into the courts." [While] [i]t is fair to infer that partisan considerations may have played a significant role in the decision to enact [the subject legislation, even if] such considerations [were] the only justification . . . , we may also assume that [the legislation] would suffer the same fate as the poll tax at issue in *Harper* [*v. Virginia Bd. of Elections*, 383 U.S. 663, 86 S. Ct. 1079 (1966) (holding that state poll tax substantially interfered with the fundamental U.S. constitutional right to vote and further failed strict scrutiny in violation of Fourteenth Amendment equal protection because it was irrelevant to a voter's qualification to vote)].

But, if a *nondiscriminatory law* is *supported by valid neutral justifications*, those justifications *should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators*. *The state interests* identified as justifications for [the Indiana photo ID requirement] are *both neutral and sufficiently strong* to require [rejection of] petitioners' *facial attack* on the statute. The *application* of the statute *to the vast majority of Indiana voters is amply justified by the valid interest in protecting* "*the integrity and reliability of the electoral process*."

116

*Crawford*, 553 U.S. at 203-04, 128 S. Ct. at 1623-24 (internal punctuation and citations omitted, emphasis added).

¶166   To be clear, the import of *Crawford* here is *not* to analogously compare the factual evidence presented by the challenging parties here with the opposition evidence presented in *Crawford*.   Rather, the purpose of *Crawford*, and similarly *Burdick*, is merely as analytical models, *inter alia*, clearly demonstrating the constitutional soundness of the *Burdick/Anderson* standard of intermediate scrutiny, free of any *undue* legislative deference, to non-discriminatory time, place, and manner voting and election administration regulations that may reasonably burden, but do not substantially interfere with, the exercise of the right to vote.   As analytical models not dependent upon the opposition evidence presented in any particular case, *Crawford* and *Burdick* stand in stark contrast to the faulty constitutional analysis put forth by the Court here in its erroneous application of strict constitutional scrutiny to the Legislature's mere 32-hour push-back of the voter registration deadline from election day to noon the day before and prohibition of paid absentee ballot collectors.   Side-by-side analytical comparison of *Crawford*'s application of the *Burdick/Anderson* standard, with the analytically incompatible intermediate scrutiny standard amorphously applied by the Court here, shines needed light on the faulty constitutional analysis applied here.[26]

---

[26] With narrow focus on the evidence presented here, the Majority dismissively ignores and avoids the analytical import of *Crawford* in a sentence.  Opinion, ¶ 84 n.18. (in contrast to the evidence presented in *Crawford* the "multitude evidence" presented here as to "the number of voters affected and the burden the laws would place *on the groups affected*" is more than sufficient to support the Court's non-equal-protection holding that the voting regulations at issue here are facially

3. Erroneous Application of an Ad-Hoc Montana-Specific Standard of Intermediate Scrutiny to Elimination of University Student ID Cards as One of Many Previously Permissible Primary Forms of Required Voter ID.

¶167 As a threshold matter, the Majority correctly recognizes that the Plaintiffs failed to satisfy their strict scrutiny burden of showing that § 13-13-114, MCA (2021) (*inter alia* eliminating state university student ID cards as one of the many previously permissible primary forms of required voter ID), will substantially interfere with the fundamental right to vote of resident Montana university students under Mont. Const. art. II, § 13. Opinion, ¶ 111. The Court further accurately disclaims equal protection as the basis of decision for the disparate burden analyses it applies to the subject legislative enactments in this case. Opinion, ¶¶ 20, 32, 60, 85, and 106. However, the Court's analysis and holding that the university student ID restriction is nevertheless *facially* unconstitutional because it disparately impacts resident university students is thus based on grounds that are manifestly erroneous and faulty to say the least. As shown *supra*, the Court first sidesteps application of the clearly applicable *Burdick*/*Anderson* standard of intermediate constitutional scrutiny for an amorphous ad hoc application of an analytically incompatible equal protection standard, and then further erroneously interjects an incompatible equal protection

unconstitutional). Aside from its reliance on clearly erroneous findings of fact, conspicuously absent from the Court's analysis is any recognition, much less reconciliation, of the well-settled principle that a legislative enactment is facially unconstitutional *only if* there are *no conceivable circumstances* under which the enactment *may constitutionally apply* under the applicable level of constitutional scrutiny. *See Mont. Cannabis Indus. Ass'n*, ¶¶ 14 and 73 (*inter alia* citing *Wash. State Grange*, 552 U.S. at 449, 128 S. Ct. at 1190 (citing *Salerno*, 481 U.S. at 745, 107 S. Ct. at 2100)). *See also Wash. State Grange*, 552 U.S. at 449 n.6, 128 S. Ct. at 1190 (legislative enactment may alternatively be facially unconstitutional if a "substantial number of its applications" fail the applicable level of scrutiny with *no* "*plainly legitimate sweep*"—internal punctuation and citation omitted, emphasis added).

"disparate impact" theory into its claimed non-equal-protection analysis. It next illogically concludes that the elimination of university student IDs, which do not include student addresses, as a primary form of voter identification is arbitrary and unreasonable because certain other acceptable forms of primary voter ID (i.e., military IDs and U.S. passports) similarly do not list the subject's address, and that university student IDs are just as reliable forms of voter identification because the state university system issues them only on exhibit of a more primary form of personal identification. Opinion, ¶¶ 112, 114, and 117.

¶168 The sole purpose of the statutory voter identification requirement is to ensure *reliable* proof of the true identity of the person who shows up to vote at the polls—not to serve as proof of citizenship or Montana residency for purposes of voter registration. *See* § 13-13-114, MCA ("before an elector is permitted to receive a ballot or vote, the elector shall present to an election judge one of the following forms of identification showing the elector's name"). Choosing instead to narrowly focus on the evidentiary showing made by the challenging parties in this case, the Court's reasoning ignores the State's indisputable factual assertion, with supporting citation to *Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 636-37 (W.D. Wisc. 2021) ("unlike other [government-issued] IDs" authorized as primary proof of voter identity, "student IDs [are not] otherwise regulated by federal, state, or tribal law, so any school's ID may be different from another's" and thus it is "rational for the legislature," for the purpose of "statutorily imposed uniformity," to require more proof of identity than "student IDs" alone "to discourage use of fake IDs and assist election

workers in recognizing valid IDs"),[27] that university student IDs are not subject to the same rigorous identification verification standards as other authorized forms of primary voter ID (i.e., Montana driver's licenses, state-issued ID cards, military ID cards, and U.S. passports), which thus provide more reliable proof of the true identity of the person who shows up to vote at the polls than student IDs. Moreover, as correctly noted by the State, there

> is no [record] evidence of any student ever using or needing a student ID to vote, [and the trial testimony of Plaintiff] Mitch Bohn acknowledged that it would be "weird" if a college student did not have a driver's license, and he was [unaware] of any college student who did not.

Opening Brief, pp. 44-45. Further undermining the Court's reasoning is its own candid acknowledgement that, in accordance with the express language of § 13-13-114, MCA, a state administrative rule furthers manifests that the limited purpose of the required primary forms of voter ID is as reliable proof of the true identity of the person who shows up to vote at the polls—not to serve as proof of citizenship or Montana residency for purposes of voter registration "which is instead" proven by sworn voter attestation "under penalty of perjury . . . when registering to vote." Opinion, ¶ 109 n.25 (citing 2 Mont. Admin. Reg. 170 (Jan 28, 2022)).[28]

---

[27] State's Opening Brief, p. 44.

[28] *See also* § 13-2-110(3)-(4), MCA ("voter registration [applicant] shall provide" a "Montana driver's license number[,] Montana state identification card number," "the last four digits of the applicant's social security number," or if "unable," an authorized "alternative form of identification"). There is no dispute that the prescribed uniform voter registration application form requires the applicant to specify his or her current Montana address.

¶169 Further of no avail, the Court rejects out-of-hand the State's perfectly valid, unrebutted, and indisputable assertion that the other authorized forms of primary voter ID (i.e., Montana driver's licenses, state-issued ID cards, military ID cards, and U.S. passports) are subject to more rigorous identification verification standards, and are thus more reliable forms of voter identification than university student IDs, because the record reflects that *state* universities issue student IDs only upon exhibit of a primary form of government-issued ID. Opinion, ¶ 114. The Court's reasoning of course overlooks that there are also a number of private universities or colleges in Montana which are not governed by the state university system.[29] Even more logically incongruous, the Court's reasoning recognizes that even the state university system requires a *primary* form of government-issued ID for issuance of a student ID, but then concludes that it is arbitrary and unreasonable for the Legislature to require a *primary* form of government-issued ID for purposes of voter identification verification. The Court's incongruent reasoning is simply mystifying.

---

[29] Incredibly, the Court dismisses this inconvenient but indisputable fact. Opinion, ¶ 114 ("[t]he record presents no evidence on student ID cards from private universities in Montana"). Montana unquestionably has a number of private universities (e.g., Carroll College/Helena, University of Providence/Great Falls, and Rocky Mountain College/Billings) with significant resident students, an indisputable fact clearly subject to judicial notice without proof under M. R. Evid. 201(b), (c), and (f). The Court further asserts, "nor are there facts cited to that are appropriate for judicial notice that suggests any standards less rigorous for other forms of student ID that used to be acceptable." Opinion, ¶ 114. So what. The Court simply cannot credibly deny the common knowledge that those private institutions issue student IDs, and that they do so for the same reasons that Montana's public institutions and every other university in this country do the same. It is simply ridiculous to suggest that Montana's private universities issue student IDs based on any standard more rigorous than the same primary forms of government-issued identification upon which our state universities issue student IDs.

¶170 The Court's cited justifications for concluding that the Legislature's elimination of university student IDs as a primary form of voter ID is not rationally related to the stated purpose of ensuring more reliable and uniform forms of primary voter identification manifest that, rather than trying to conceive of a possible reasonable justification for the legislative restriction, as deemed "improper" in Opinion, ¶ 40, the Majority is instead conceiving of possible justifications, however flimsy and thin, upon which to invalidate a perfectly reasonable voter ID restriction, however imperfect. Again, the State's failure to present any evidence countering the plaintiffs' evidence certainly does not justify the Majority's unsupported and specious reasoning here. The fact that an enactment does not serve the Legislature's stated purpose as perfectly as the Majority would like is certainly not a sufficient basis upon which to logically or legally conclude that the enactment is either arbitrary or will not reasonably further a legitimate government purpose. The Majority's reasoning erroneously gives no deference or credence whatsoever to the Legislature's authority and duty under Mont. Const. art. IV, § 3, or the perfectly reasonable manner, however imperfect, in which it chose to exercise that authority and carry out that duty here.[30] The general rationale put forth by the Majority to strike down the challenged legislation eliminating university student IDs as a primary form of voter ID is patently fallacious, illogical, and thus improperly interferes with the Legislature's exercise of its exclusive constitutional prerogative.

4. Conclusion.

---

[30] *See, e.g.*, Opinion, ¶ 59 ("[w]e need not balance the State's [asserted] interests against the burden imposed because the State has not demonstrated that its interests are reasonable").

122

¶171 For the foregoing reasons, the Majority erroneously concludes that the Legislature's push-back of the voter registration deadline from election day to noon the day before, prohibition of paid absentee ballot collectors, and eliminating the Montana university student ID as an acceptable primary form of required voter identification are *facially* unconstitutional in violation of Mont. Const. art. II, § 13. Courts have no constitutional power or authority to act as a "super-legislature" second-guessing "the wisdom, need, and propriety" of legislative enactments that may "touch" upon "economic problems, business affairs, or social conditions," or that merely regulate the time, place, and manner of exercise of the right to vote in furtherance of important state regulatory interests and without substantially interfering with exercise of the right. *See Griswold v. Connecticut*, 381 U.S. 479, 482, 85 S. Ct. 1678, 1680 (1965); *Cutone v. Anaconda Deer Lodge*, 187 Mont. 515, 524, 610 P.2d 691, 697 (1980) (this Court is not "a super-legislature" and thus generally has no authority to overturn non-arbitrary public policy determinations of the Legislature within the bounds of its constitutional power); *Wash. State Grange*, 552 U.S. at 451-52, 128 S. Ct. at 1191-92 (noting broad state power to regulate the "election process . . . subject to the limitation that it may not be exercised in a way that violates specific provisions of the Constitution," particularly "First Amendment rights . . . including the freedom of political association"—if only "modest burdens" are imposed, "important [state] regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions"—internal punctuation and citations omitted). However, in an unprecedented exercise of unrestrained judicial power overriding public policy determinations made by the Legislature in the exercise of its constitutional discretion, however ill-advised to some, the

123

Majority today strikes down three distinct legislative enactments on the most dubiously transparent of constitutional grounds.

¶172　As we must in the proper exercise of our own exclusive constitutional authority, this Court no doubt will continue to whistle-down legislative enactments that exceed the clear constitutional limitations on the exclusive power and authority of the Legislature.  In doing so, however, it is imperative to the preservation of the sacrosanct separation of powers dictated by the Montana Constitution that we consistently recognize, however distasteful in the political firestorm of the day, that the broad legislative authority, and resulting public policy prerogative *exclusively granted to the Legislature* by the Montana Constitution, necessarily includes the power and discretion *within constitutional limits*, to enact legislation that many may view as, and occasionally may in fact be, bad public policy contrary to the public interest.  Only recently, this Court has correctly chided the Legislature to stay in its own well-defined lane of constitutional authority.  *See McLaughlin v. Mont. State Legislature*, 2021 MT 178, ¶¶ 5-52, 405 Mont. 1, 493 P.3d 980; *McLaughlin*, ¶¶ 58-78 (McKinnon, J., concurring); *McLaughlin*, ¶¶ 79-83 (Sandefur, J., concurring). The precious distributed-powers constitutional form of government that the good citizens of this State have chosen to live under since 1889 will survive and be well-served only if we do the same.[31]   Unfortunately, that did not occur here regarding three of the four legislative enactments at issue.  I dissent.

---

[31] *Accord State v. Hunt*, 450 A.2d 952, 963-64 (N.J. 1982) (Handler, J., concurring) ("uncritical" state court reliance on "their state constitutions for convenient solutions to problems not readily or obviously found elsewhere" is fraught with danger of eventual "erosion or dilution of constitutional doctrine").

/S/ DIRK M. SANDEFUR

Justice Jim Rice joins in the concurring and dissenting Opinion of Justice Sandefur.

/S/ JIM RICE